## CHAPMAN *v.* COUNTY OF DOUGLAS.

**A.** conveyed, March 5, 1859, to a county in Nebraska certain lands for a "poor-farm," and they were thereafter used as such. The county, pursuant to its agreement, made one cash payment, and for the remainder of the stipulated consideration gave its notes secured by mortgage, and payable respectively in one, two, three, and four years. A. assigned the notes to B. Some time thereafter, the Supreme Court of the State decided that, by the purchase of lands for such a purpose, a county could not be bound to pay at any specified time the purchase-money, or to secure it by mortgage upon them, but was limited to a payment in cash and to the levy of an annual tax to create a fund wherewith to pay the residue. A. and B., the notes remaining unpaid, filed, Sept. 10, 1877, a bill praying for a reconveyance and an accounting, or, should the county elect to retain the lands, then for a decree for the value of them. *Held,* 1. That in view of that decision, the contract being unauthorized only so far as it relates to the time and mode of paying the purchase-money, and the title to the lands having passed by the conveyance, the county holds that title as a trustee for the benefit of B., and that he is entitled to the relief prayed for. 2. That unless the sum due on account of the purchase-money, after a proper allowance shall be made as a compensation for a failure of A.'s title to a small part of the lands, be paid within a reasonable time, to be fixed by the court below, having reference to the necessity of raising the same by taxation, as prescribed and limited by the statute, the county be required to execute and deliver a deed, releasing to A. all the title acquired under his deed, and that he convey the same to B. 3. That the suit is not barred by the Statute of Limitations.

APPEAL from the Circuit Court of the United States for the District of Nebraska.

This is a bill in equity filed Sept. 10, 1877, by Chapman, a citizen of Tennessee, and the representatives of Charles A. Ely, deceased, citizens of Ohio, against the county of Douglas, a municipal corporation of Nebraska.

The object of the bill is declared to be, and the prayer corresponds to it, to compel the county to surrender possession of two certain tracts of land therein described, one of one hundred and sixty acres and one of ten acres; and to reconvey and release the title thereto, which the county acquired under a deed made by Chapman to the county on March 5, 1859; and for an account of the rents and profits thereof; or, "in case said county of Douglas and the corporate authorities thereof shall elect and request to be allowed to retain and hold the land described, then and in that case to compel said county and the corporate authorities thereof to pay to or for your ora-

tors, as the court shall direct, the reasonable price and value of said land, as stated in said deed of conveyance, with lawful interest thereon from the date of said deed to the time of the making of such payment."

. It appears that on March 4, 1859, an agreement under seal was entered into between Chapman of the first part and the county of Douglas, the latter acting by the county commissioners, of the second part, whereby he agreed to sell and convey the premises in controversy " on the following conditions, to wit: That the party of the second part shall pay to the party of the first part, at the ensealing and delivery of a warrantee conveyance from the party of the first part to the party of the second part of the real estate aforesaid, two thousand dollars ($2,000) in county orders of the county of Douglas aforesaid on the treasurer of said county of Douglas, and the balance of six thousand ($6,000) dollars in four equal annual payments, together with interest on the amount due at ten (10) per cent per annum until paid ; and the said party of the first part will, when required, resign to and give up the possession of said property to the party of the second part, or its assigns or agents, immediately on the payment of the first payment hereinbefore enumerated, and put the said county of Douglas or its agents in full and peaceable possession of said described property.   And the said party of the second part agrees to purchase said property on the terms aforesaid of and from the party of the first part, and for the security of the deferred payments, as hereinbefore set forth, to give a mortgage upon said described property to the party of the first part."

On the next day, in pursuance of this agreement, Chapman and wife executed and delivered to the county commissioners a deed to the county of Douglas for the land, which was accepted and placed by them on record.  The first instalment of the purchase-money, $2,000 in county orders, was paid at that time, when, also, the county commissioners, in the name of the county, executed and delivered to him the four promissory notes required by the agreement, payable in one, two, three, and four years from that date respectively, and a mortgage, in the usual form of a conveyance in fee, with a defeasance, to secure the payment of the same, which was accepted and recorded.

The property was purchased for the use of the county for a poor-house and farm. Possession of it was taken immediately by the county authorities, and it has been improved and used for that purpose continuously ever since. The title of Chapman as to the one hundred and sixty acre tract was perfect, but as to the ten acre tract has failed.

On Nov. 26, 1860, the notes and mortgage were assigned, for value, to Charles A. Ely, who having since deceased, his rights have devolved upon his legal representatives. On June 13, 1868, William A. Ely, a minor and the devisee of Charles A. Ely, by his next friend and guardian, commenced a suit in the District Court for Douglas County for the foreclosure of the mortgage, to which a demurrer was interposed, on the ground that the notes and mortgage were void, *ab initio*, for want of power on the part of the county to make them, and also because any action on them was barred by the Statute of Limitations. This demurrer having been sustained, the plaintiff dismissed the action on July 21, 1868, without prejudice. On Aug. 8, 1868, a similar suit, by bill in equity, was begun in the Circuit Court of the United States, which, on November 19, in the same year, was dismissed without prejudice; and, on March 15, 1869, a similar bill was filed in the same court, to which the same defences, as above stated, were raised upon a demurrer, which was sustained, and on Dec. 30, 1872, the bill was dismissed without prejudice.

The answer to the present bill admits that no part of the $5,000 of the original purchase-money has been paid, and that the rents, issues, and profits of the premises, since the county has been in possession of them, exceed the amount of the first instalment which was paid, and sets up the same defences as before, that the mortgage and notes are void for want of power on the part of the county to make them, and that any action accruing to the complainants is barred by lapse of time and the Statute of Limitations. It also admits " that both the said commissioners and the said Chapman believed that the said county had full power and authority to purchase said lands and execute the said notes and mortgage for the unpaid part of the purchase price, and that all the actings and doings of the said parties in that behalf were had, made, and done in

perfect good faith and for good and sufficient considerations, in all things conformable to equity and good conscience, save as is hereinafter stated." This saving is that "the sum paid by this defendant for said lands, to wit, $2,000, was the full, fair value thereof at the time of the said purchase and sale, and the amount of the said notes and mortgage was just so much in excess of the true value thereof. This defendant is informed and believes, and now here charges, that the said notes and mortgage were made between the said Chapman and the said commissioners, acting in the name of said county, with the full knowledge on the part of all of them that the full and fair value of the premises had been already paid therefor by the said county, and that the agreement to give the said notes and mortgage was unjust and oppressive toward the said county, and that, in fact, they were without consideration, and that the giving thereof was induced by some secret and fraudulent agreement or understanding between the said commissioners, or some of them, on the one side, and the said Chapman on the other." It also admits that during the delay of the complainants in bringing their suit "the evidences of the fraudulent, corrupt, oppressive, and unjust contract of purchase have disappeared." No evidence in support of the alleged fraud is, therefore, offered, and the defendant is constrained to rely upon the Statute of Limitations, if any cause of action ever existed. In reference to the allegation of the oppressive amount of the price agreed to be paid, in addition to the fact admitted in the answer, that the rents and profits accrued to the county since it has been in possession amounted in value to more than the payment made, it is also urged in argument by its counsel against a rescission of the contract, that "there has been such a change of circumstances that that mode of relief would be most oppressive. This land, purchased when the county was very sparsely settled, and situated very near to a town which has recently grown to great importance, must have greatly appreciated in value. Besides which fact, there is the further one already adverted to, that the county has improved it to the extent of thirty thousand dollars." It is, therefore, insisted that the county should be permitted to retain the land without paying for it.

On final hearing the bill was dismissed, and the decree, to that effect, is brought here for review by this appeal.

*Mr. Charles C. Bonney* and *Mr. George Willey* for the appellants.

*Mr. John C. Cowin* and *Mr. James M. Woolworth* for the appellee.

MR. JUSTICE MATTHEWS delivered the opinion of the court, and, after stating the case as above, proceeded as follows: —

The statute in force at the date of the transaction in question, conferring power on the county commissioners over the subject, provides, "That the county commissioners in each county are authorized, whenever they see fit to do so, to establish a poor-house ; " and that "they may take to the county, by grant, devise, or purchase, any tract of land, not exceeding six hundred and forty acres, for the purposes of said poor-house." Sect. 17 and 18, Rev. Stat. Neb., c. 40. Sect. 19 of the same chapter declares that "said commissioners are hereby empowered to receive donations to aid in the establishment of such poor-house ; and also empowered, from time to time, as they shall see fit, to levy and collect a tax, not exceeding one per cent, on the taxable property in the county, and to appropriate the same to the purchase of land, not exceeding the aforesaid six hundred and forty acres ; and to erect and furnish buildings suitable for a poor-house, and to put into operation and to defray the actual expenses of said poor-house, should the labor of the inmates be inadequate thereto." By sect. 23 of the same act the commissioners are authorized, if they deem it to be for the interest of the county, to appropriate out of any other money belonging to the county any sum not exceeding $2,500 for the purpose of purchasing a farm and erecting thereon suitable buildings, as contemplated in the sections before referred to.

These provisions of the statute were construed by the Supreme Court of the State in *Stewart* v. *Otoe County*, 2 Neb. 177. It does not appear from the report when the decision was made, but as the case arose upon a contract dated in January, 1870, it must, of course, have been long after the making of the contract, which is the foundation of the present litiga-

-tion.  It was rendered in an action brought upon a similar contract to recover against Otoe County damages for its refusal to accept a deed and execute the note and mortgage contemplated.  A judgment sustaining a general demurrer to the petition was affirmed, on the ground that the contract was illegal and void.  The court said: "There is no authority of law for the county commissioners to bind the county in the manner contemplated.  They cannot give a promissory note, nor can they mortgage the property of the county.  Should they formally do so, their action would be a nullity.  In the purchase of land for a poor-farm, the authority of the commissioners of a county is very clearly set forth.  The mode of raising the money, and paying it over, are all definitely stated.  These statutes set a limit beyond which they cannot go.  They are a guide, not only to the commissioners, but equally so to all persons dealing with them, who must see to it that their contracts are within the boundaries thus described. . . . Here we find the authority, and indeed the only authority, for the purchase and payment of money for a "poor-farm" by the county commissioners; and here, too, are specially designated the money that may be used for that purpose, together with the mode of raising it.  But there is not one word about mortgaging the property of the county to secure the payment of the purchase-money at a given time.  The statutes provide the only security that can be given.  The public faith is pledged; and a tax, not exceeding one per cent, may be levied upon all the taxable property of the county annually, and, when collected, paid to the person entitled thereto by an order upon the treasurer of the county, payable out of that special fund."

This decision has been accepted by all parties to this suit, and we are not asked to consider any question as to its correctness, or as to our obligation to adopt it.  We, therefore, assume it to be the law of Nebraska, applicable to the case, and the basis of further inquiry as to the relative rights of the parties to this litigation.  It expressly declares that the county commissioners had power to purchase a poor-farm, but that the power does not extend to an agreement to pay at a definite time, or to give as security for payment a lien upon the land.  The vendor must either receive the purchase-money on delivery

of the deed, or wait for its payment in the due course of administration, by the appropriation of the taxes levied, collected, and paid into the treasury applicable to that purpose.

If, in the present case, such had been the original understanding between the parties, and the deed had been delivered without payment, but upon orders drawn upon the county treasurer payable according to law, the vendor would have been obliged to wait during the reasonable delays of administration. "Whoever," said that court, in *Brewer* v. *Otoe County*, 1 Neb. 373, "deals with a county and takes in payment of his demand a warrant of the character of these, no time of payment being fixed, does so under an implied agreement that if there be no funds in the treasury out of which it can be satisfied, he will wait until the money can be raised in the ordinary mode of collecting such revenues. He is presumed to act with reference to the actual condition and the laws regulating and controlling the business of the county. He cannot be permitted, immediately upon the receipt of such warrant, to resort to the courts to enforce payment by judgment and execution, without regard to the condition of the treasury at the time, or the laws by which the revenues are raised and disbursed."

Accordingly, in that case, it was decided that the Statute of Limitations did not apply to cases of such claims against counties. The court, on that point, said: "But these warrants do not, nor was it the intention of the legislature that they should, fall within the operation of this act. . . . Nor can any action rightfully be brought on such warrant until the fund is raised, or at least sufficient time has elapsed to enable the county to levy and collect it in the mode prescribed in the revenue laws. That the legislature never intended that county warrants should be affected by the limitation act before referred to, is evident, I think, from the whole course of legislation respecting them. As late as the 12th of February, 1866, it was enacted that ' all debts heretofore incurred by the county commissioners of any county, acting in good faith, and duly recorded at the time on their books, shall be deemed valid and the county shall be held liable for the same.' Chap. 5, sect. 1, Rev. Stat. . . . From these, as well as numerous other enact-

ments of the legislature that might be cited, I have reached the conclusion that the plea of the Statute of Limitations cannot be successfully made against these warrants, and that whenever it can be shown that the funds have been collected out of which they can be paid, or sufficient time has been given to do so in the mode pointed out in the statute, their payment may be demanded, and if refused, legally coerced."

And if, in such cases, a proceeding in *mandamus* should be considered to be the more appropriate, and, perhaps, the only effective remedy, it also is not embraced in the Statute of Limitations prescribed generally for civil actions. The writ may well be refused when the relator has slept upon his rights for an unreasonable time, and especially if the delay has been prejudicial to the defendant, or to the rights of other persons, though what laches, in the assertion of a clear legal right, would be sufficient to justify a refusal of the remedy by *mandamus* must depend, in a great measure, on the character and circumstances of the particular case. *Chinn* v. *Trustees*, 32 Ohio St. 236 ; Moses on Mandamus, 190. There is no statute of limitations in Nebraska applicable to that proceeding.

In the present case, however, it was not the understanding of the parties that the vendor should await the collection of taxes, as prescribed by the statute, for the payment of the purchase-money, but, on the contrary, there was an agreement for payment in a definite time, without regard to the condition of the county treasury, and for security by way of notes and mortgages. The agreement, as we have assumed, so far as it relates to the time and mode of payment, is void ; but the contract for the sale itself has been executed on the part of the vendor by the delivery of the deed, and his title at law has actually passed to the county. As the agreement between the parties has failed by reason of the legal disability of the county to perform its part, according to its conditions, the right of the vendor to rescind the contract and to a restitution of his title would seem to be as clear as it would be just, unless some valid reason to the contrary can be shown. As was said by this court in *Marsh* v. *Fulton County*, 10 Wall. 676, 684, and repeated in *Louisiana* v. *Wood*, 102 U. S. 294, "the obligation to do justice rests upon all persons, natural and artifi-

cial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation." See also *Miltenberger* v. *Cooke*, 18 Wall. 421. The illegality in the contract related, not to its substance, but only to a specific mode of performance, and does not bring it within that class mentioned by Mr. Justice Bradley in *Thomas* v. *City of Richmond*, 12 id. 349. The purchase itself, as we have seen, was expressly authorized. The agreement for definite times of payment and for security alone was not authorized. It was not illegal in the sense of being prohibited as an offence; the power in that form was simply withheld. The policy of the law extends no further than merely to defeat what it does not permit, and imposes upon the parties no penalty. It thus falls within the rule, as stated by Mr. Pollock, in his Principles of Contract, 264: "When no penalty is imposed, and the intention of the legislature appears to be simply that the agreement is not to be enforced, then neither the agreement itself nor the performance of it is to be treated as unlawful for any other purpose." *Johnson* v. *Meeker*, 1 Wis. 436.

The principle was applied in the case of *Morville* v. *American Tract Society*, 123 Mass. 129, 137, where it was said: "The money of the plaintiff was taken and is still held by the defendant under an agreement which it is contended it had no power to make, and which, if it had power to make, it has wholly failed on its part to perform. It was money of the plaintiff, now in the possession of the defendant, which in equity and good conscience it ought now to pay over, and which may be recovered in an action for money had and received. The illegality is not that which arises where the contract is in violation of public policy or of sound morals, and under which the law will give no aid to either party. The plaintiff himself is chargeable with no illegal act, and the corporation is the only one at fault in exceeding its corporate powers by making the express contract. The plaintiff is not seeking to enforce that contract, but only to recover his own money and prevent the defendant from unjustly retaining the benefit of its own illegal act. He is doing nothing which must be regarded as a necessary affirmance of an illegal act."

The decision of this court in *Hitchcock* v. *Galveston*, 96 U. S. 341, 350, covers the very point.   There a recovery was allowed for the value of the benefit conferred upon the municipal corporation, notwithstanding, and, indeed, for the reason, that the contract to pay in bonds was held to be illegal and void.   "It matters not," said the court, " that the promise was to pay in a manner not authorized by law.   If payments cannot be made in bonds, because their issue is *ultra vires*, it would be sanctioning rank injustice to hold that payment need not be made at all.   Such is not the law."

This doctrine was fully recognized by the Supreme Court of Nebraska as the law of that State in the case of *Clark* v. *Saline County*, 9 Neb. 516, in which it adopts, from the decision of the Supreme Court of California in *Pimental* v. *City of San Francisco*, 21 Cal. 362, the following language: " The city is not exempted from the common obligation to do justice which binds individuals.   Such obligations rest upon all persons, whether natural or artificial.   If the city obtain the money of another by mistake, or without authority of law, it is her duty to refund it, from this general obligation.   If she obtain other property which does not belong to her it is her duty to restore it, or if used to render an equivalent therefor, from the like obligation.   *Argenti* v. *San Francisco*, 16 Cal. 282.   The legal liability springs from the moral duty to make restitution."

The conveyance by Chapman to the county of Douglas passed the legal title, but upon a condition in the contract which it was impossible in law for the county to perform.   There resulted, therefore, to the grantor the right to rescind the agreement upon which the deed was made, and thus to convert the county into a trustee, by construction of law, of the title for his benefit, according to the often repeated rule, as stated by Hill on Trustees, 144, that " whenever the circumstances of a transaction are such that the person who takes the legal estate in property cannot also enjoy the beneficial interest, without necessarily violating some established principle of equity, the court will immediately raise a constructive trust and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties who, in equity, are entitled to the beneficial enjoyment."   Upon this principle the vendor of real

estate is treated as trustee of the title for the purchaser; and the mortgagee, having the legal title, after payment of the mortgage debt, is a trustee for the mortgagor. The analogy is complete between these and every case, of which the present is one, where the holder of the legal title is under a duty to convey to another.

But, admitting that Chapman was entitled to call for a reconveyance, it is alleged that the Statute of Limitations of Nebraska, which bars the right to recover the title to real estate in ten years from the time it first accrued, defeats the recovery.

The Statute of Limitations in force on March 5, 1859, which was the date of the deed, prescribed twenty-one years after the cause of action shall have accrued as the period within which an action for the recovery of the title to lands must be brought. Rev. Stat. Neb. 1866, p. 395, sect. 6.

On Feb. 12, 1869, the legislature of Nebraska passed an act, which took effect July 1, 1869, which amended this section so as to reduce the limitation to ten years. It is not denied that if Chapman's cause of action first accrued to him on March 5, 1859, this amendment could not operate upon it, because to give it that effect would be to take away an existing right of action by mere legislation, as the ten years would then have fully expired. It is, therefore, claimed that his right of action for a reconveyance of the title could only have first accrued when the first instalment of the purchase-money became due, that is, on March 5, 1860, which left eight months after the statute took effect before the ten years' limitation would expire, which, it is claimed, would be a reasonable time within which to require that suits upon existing causes of action should be brought. But this view cannot be supported; for the original contract for payment, at a fixed time, is rendered invalid, for the same reason that avoided the notes and mortgage, the objection being, according to the decision of the Supreme Court of Nebraska, that the county had no power to bind itself to pay, in any other manner than that prescribed by the statute. Hence, it must be held, in this aspect of the case, that the right of action was not postponed, after the date of the deed, by the credit given, and if it accrued at that time,

the limitation was twenty-one years, according to the statute then in force, within which the present suit was in fact brought.

But the more satisfactory answer to this defence is, that none of the statutes of limitation referred to apply to the case at all. We have already seen that by the decision in *Brewer v. Otoe County*, 1 Neb. 373, it is the declared law of Nebraska that the claim against the county for the purchase-money, on the supposition that the understanding had been to accept payment according to the terms of the statute, was not liable to the bar of the limitation acts. So that the obligation of the county to pay would not be extinguished by the statutory lapse of time. Now, although the right of Chapman to rescind the contract and demand a reconveyance accrued at the very date of the deed, he was not bound to exercise the right, and his cause of action did not accrue, until he had made manifest his election. He had the right to treat as null that part of the contract which was illegal, and having executed it on his part, to waive performance according to its terms, on the part of the county, and wait a reasonable length of time for the county to make the payment in the mode made lawful by the statute, before exerting his power to rescind the contract. Until that time had elapsed, and until, after that, Chapman had elected to rescind, there was no existing cause of action, and consequently nothing upon which the Statute of Limitations could begin to take effect. When that reasonable time expired we have no means of determining. It would depend upon circumstances not disclosed in the record, such as the state of the county treasury, the extent of its other obligations, the value of the taxable property, and its general financial condition. There is nothing whatever to show that the delay that has taken place in filing the present bill has been unreasonable. It is impossible, therefore, to say that any statute of limitations has even begun to run against the cause of action, much less that its bar has become complete.

There is nothing, therefore, to prevent the relief prayed for being granted, if it can be done without injustice to the defendant. On this point, it is said, it would be inequitable to decree a rescission of the contract and a restoration of the title

to and possession of the property, because the parties cannot be placed *in statu quo;* that the circumstances have greatly changed by the increase in the value of the property and the expensive improvements that have been put upon it by the county. If the relief asked and expected was an unconditional reconveyance of the title and surrender of possession, this would undoubtedly be true. But such is not the case. Any such injurious and inequitable results as are deprecated may easily be averted by the simple payment of the amount due on account of the purchase-money, which the appellants consent to receive, which is within the statutory powers of the county, and for which proper provision may be made in the decree.

The principles on which we proceed to establish the right of the appellants to the relief prayed for were announced and acted upon by this court in *Parkersburg* v. *Brown*, in which it was also held that the equity of the original grantor of the property sought to be reclaimed passed by an assignment of the void securities. 106 U. S. 487. This settles the relative rights of Chapman and his co-complainants, the representatives of Ely, and entitles the latter, in the name of the former, to the relief prayed for in the bill.

And, conversely, the right of the county, represented by its taxpayers, to require a rescission of such a contract, on condition of a surrender of the void securities on the part of the vendor, and a reconveyance of the title in consideration of which they were issued, was recognized by this court in *Crampton* v. *Zabriskie*, 101 U. S. 601.

In not granting this relief the Circuit Court erred, and its decree must be reversed, with directions to ascertain the amount due from the county of Douglas on account of the purchase-money of the poor-farm, making any proper allowance as a compensation for the failure of the title to the ten-acre tract, and thereupon to render a decree, unless the amount so found due be paid within a reasonable time, to be fixed by the court, having reference to the necessity of raising the same by taxation, as regulated by the statute, that the county of Douglas be required by its commissioners to execute and deliver a deed, releasing to Chapman all the title acquired by it by

virtue of the deed from him of March 5, 1859, to be conveyed by Chapman to William A. Ely, his co-complainant, and sole representative of Charles A. Ely, upon such terms as the equities of the case may require. It is

*So ordered.*