IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## EASTERN DIVISION.

---

### KNOXVILLE, SEPTEMBER TERM, 1905.

---

STATE *et al. v.* MAYOR and ALDERMEN of CITY of KNOX-
VILLE.

*(Knoxville.* September Term, 1905.)

1. **PUBLIC SCHOOLS.** Recovery by State and county from city
for excess of fund received by it upon false reports of scholastic
population.

The State and county may, for the use of their respective school
funds, recover from a municipal corporation the excess above
the proper amount of school funds received by it, through fraud
or mistake, upon false and padded reports of its scholastic pop-
ulation, although the fund has been expended for governmental
purposes in the maintenance of its schools.

Constitution cited: Art. 11, sec. 12.

Cases cited and approved: Land Co. v. Jellico, 103 Tenn., 320;
Ernest v. West Covington, 76 S. W., 1089, 63 L. R. A., 652;
Hitchcock v. Galveston, 96 U. S., 341; Louisiana City v. Wood,
102 U. S., 294; Chapman v. Douglass Co., 107 U. S., 348; Moses
115 Tenn.·                                    ( 175 )

v. McFarlan, 2 Burr., 1005; Morville v. Society, 123 Mass., 129; Argenti v. San Francisco, 16 Cal., 282.

2. **SAME.** City board of education enumerators of scholastic population are the agents of the city.

The city board of education, put in charge of the city schools under the city charter and ordinances passed pursuant thereto, and the enumerators appointed by such board to take the census of the scholastic population are the agents of the city, and not of the State. (*Post, pp.* 179-182, 185-192.)

Acts cited and construed: 1873, ch. 25, secs. 2 and 51; 1885 (ex. ses.), ch. 8, secs. 63, 64, and 66.

Cases cited and approved: University v. Knoxville, 6 Bax., 166; Edmondson v. Board, 108 Tenn., 562.

3. **MUNICIPAL CORPORATIONS.** Defined.

A municipal corporation is a body corporate established by law to share in the civil government of the country, but chiefly to regulate the local or internal affairs of the city, town, or district incorporated. (*Post, p.* 191.)

Case cited and approved: University v. Knoxville, 6 Bax., 166.

4. **SAME.** Decree for State and county school funds wrongfully received and expended by city to be satisfied out of general funds.

A decree in favor of the State and county and against a city for the excess of the proper amount of school funds received and expended by it would, like any other judgment or decree, be satisfied out of the general revenues or such as may be derived from a tax imposed to meet the decree, and not from the current school revenues. (*Post, pp.* 192-194.)

5. **INTEREST.** Allowed from date of the filing of the bill, when.

Interest will be allowed on the recovery as shown in the first and fourth headnotes from the date of the filing of the bill. (*Post, p.* 194.)

State v. Knoxville.

FROM KNOX.

Appeal from the Chancery Court of Knox County.—
JOSEPH W. SNEED, Chancellor.

SHIELDS, CATES & MOUNTCASTLE and H. VAN DEVEN-
TER, for complainants.

J. W. CALDWELL, J. W. CULTON, and JOUROLMON,
WELCKER & HUDSON, for defendants.

MR. CHIEF JUSTICE BEARD delivered the opinion of the
Court.

The present suit was brought at the instance of the
superintendent of public instruction for the State of
Tennessee, for and in the name of the State of Tennessee,
for its own use and for the use of Knox county, and in
the name of that county, by order of its quarterly court,
for its own use, and for the use of its scholastic popula-
tion residing outside of the corporate limits of the city
of Knoxville, and by and in the name of the trustee of
Knox county, as the legal custodian of the school funds
belonging to Knox county, "to recover from the defend-
ant, the mayor and aldermen of the city of Knoxville," for
the benefit of the parties entitled thereto, certain school
funds which it is alleged the defendant had unlawfully

obtained from the trustee of Knox county and had misappropriated and illegally converted to its own use."

The bill charges that the defendant, or its agent, the board of education, pretended to take a census of its scholastic population for each of the years from 1897 to 1902 inclusive, and that it made false and padded reports thereof in each of said years to the county superintendent of public instruction for Knox county, and through him and other officers of the State to the trustee of Knox county, upon which it succeeded in drawing a pro rata of the school funds in the hands of the trustee during each of these years far in excess of what it was entitled.

The defendant answered this bill and set up four grounds of defense as follows:

(1)  That it did not falsify or pad its reports, and did not draw any money from the trustee of Knox county in excess of what it was entitled to.

(2)  That said moneys were received and expended by it in its governmental capacity as an arm of the State government in the support of its public schools, and that no recovery can therefore be had against it for the same in its corporate capacity.

(3)  That this money had already been expended by the city of Knoxville in the education of its school children, and that it can neither be recovered from it, nor can the funds due to it in the future be held to replace the funds it has so withdrawn, because it would be an act of injustice to the present and future scholastic pop-

ulation of the city, who are, and will be, entitled to the benefits of this money.

(4)   The defendant pleaded the statute of limitation of three, six, and ten years.   This last defense, however, was not relied upon, and therefore will not be further noticed.

Upon the hearing of the cause the chancellor found that there had been a flagrant falsification of the reports of the scholastic population of Knoxville for the years mentioned in the bill, and that upon the basis of these false reports the city had laid claim to and had received from year to year large sums of money from the county trustee as its *pro rata* of the public funds in his hands for distribution among the common schools in the county of Knox, and that these receipts, for the years named, aggregate $62,797.72, and accordingly he decreed in favor of complainant as against the defendant for this sum with all the costs of the cause.

From this decree both parties appealed.   The complainants were dissatisfied because the chancellor failed to allow interest upon each annual receipt of this money, and the city appealed upon the ground that it was in no, sense liable for the moneys so received.   The cause was heard by the court of chancery appeals, and that court reversed the decree of the chancellor and dismissed the bill, upon a ground which will be hereafter stated and examined.

The court of chancery appeals, agreeing with the chan-. cellor, has found as a fact that for the years named in

the bill the reports of the scholastic population of the city of Knoxville were grossly falsified by the enumerators of the board of education of the city, and that the board from year to year had certified them to the superintendent of public instruction of the county of Knox as correct, and by him they were certified to the State superintendent of public instruction, and by the latter to the State comptroller, and that this officer had issued, each of the years named, his warrant on the treasurer of the State, payable to the trustee of Knox county, for the city's *pro rata* of the school fund controlled by ʹthe State, and that the trustee of Knox county out of the proceeds of these warrants had paid, from time to time, to the city of Knoxville its proportionate part thereof upon the understanding that these reports were honestly made. That court further finds that these exaggerated or padded reports were prepared and furnished by the board of education of the city of Knoxville through agencies of its own creation. On this point the language of that court is as follows: "As a matter of fact, getting at the root of the contention in the case, the city of Knoxville received from the proper public authorities charged with the distribution of the public school funds a larger *pro rata* of these funds than it was entitled to by reason of the false reports as to the number of its scholastic population, which *pro rata* were turned into its general treasury, and thereafter paid out through its board of education to the support of its city schools."

As we understand the theory, on which the defendant

State v. Knoxville.

seeks to maintain the decree of the court of chancery appeals, embraces two main propositions, the first of which, as stated in the words of its counsel, is as follows: "The city, the board of education, the census taker, the county superintendent, and the county trustee were all necessary governmental agencies in handling the school fund, and by well-settled principle of law no one of them can be held for either the misfeasance or the nonfeasance of another."

The second of these propositions is thus stated by the counsel of the appellee: "The fund was appropriated by the agents of the State to the support of the public schools of Knoxville, and merely passed through the hands of the city government to the public use for which it was intended; and as the injury complained of was caused by another agent, or subagent, who in law was the agent of the principal, to wit, the State, the city cannot be called upon a second time to pay out said money because of the wrongful act of said subagent."

As to the first of these propositions, it is true, as is insisted by the appellee, that a municipal corporation possesses two kinds of power, one governmental, or public, in the execution of which it is not answerable for the wrongs of its agents, and the other private, in which latter case it stands as an individual, subject to legal liability for an improper exercise of this power through its employees, resulting in injury to another.  Our own reports contain a number of cases which illustrate the dual nature of such a corporation, and recognize, how-

ever indistinct it may be, that there is a dividing line between its public and its private character. It is unnecessary to refer to these cases as all are familiar to the profession.

We think it equally true that, while the raising of taxes for the public schools in the city of Knoxville was a proper municipal purpose, yet, in the management of these schools, the city was engaged in governmental work. This being the case, the corporation would be exempt from liability for the faulty construction or want of repairs of its school buildings, or the wrongs of its servants employed in this work (*Ernst* v. *West Covington* [Ky.], 76 S. W., 1089, 63 L. R. A., 652), resulting in injury to a pupil or a stranger, yet we do not think this concession meets the contention of the complainants. They put their case upon the ground that through the fraud of certain of its agents the city has received and appropriated to its own benefit large amounts of money, for several successive years, to which it was not entitled, and upon an implied assumpsit that it is bound to pay back to the complainants, who were entitled to recover the same, these several sums. As a part of this contention, it is insisted by complainants that it is immaterial whether these moneys were received by the city in its governmental or private capacity.

Putting the proposition of complainants in the words of their counsel, it is as follows: "Even if the city received the money in its governmental capacity, the complainants are nevertheless entitled to a decree against it

for this money.   The obligation to do justice rests upon all persons, natural and artificial alike, and, the defendant having obtained this money wrongfully and without authority, the law will compel restitution without regard to what the defendant did with it."

While the proposition is thus broadly stated, yet the argument of the complainants goes no further in the present litigation than to insist that, to the extent of the benefits received by the city from the appropriation of these moneys thus wrongfully received, it is bound to make restitution.   It is certainly true, as well supported by authority, if a municipal corporation or other public corporation obtains the money, or the labor, or the property of others, and appropriates the same upon unenforceable contracts, the law, without more, will compel it to respond in a sum equal to the benefits received therefrom.   In *Louisiana City* v. *Wood,* 102 U. S., 294, 26 L. Ed., 153, it is held that, where bonds of a city cannot be enforced because defectively executed, the money paid for them to the city can be recovered.   Among the cases there referred to is that of *Moses* v. *McFarlan,* 2 Burr, 1005, in which it is stated, as a rule of the common law, "that an action lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition."   In *Morville* v. *American Tract Society,* 123 Mass., 129, 25 Am. Rep., 40, it is said:   "The money of the plaintiff was taken and is still held by the defendant under an agreement which it is contended it has no power to make, and which, if it had the power to make, it has wholly failed on its part to

perform. It was money of the plaintiff now in the possession of the defendant, which in equity and good conscience it ought now to pay over and which may be recovered back in an action for money had and received. The illegality is not that which arises where the contract is in violation of public policy or of sound morals, and under which the law will give no aid to either party. The plaintiff himself was chargeable with no illegal act, and the corporation is the only one at fault in exceeding its corporate powers by making the express contract, but only to recover his own money and prevent the defendant from unjustly retaining the benefit of its own illegal act. He is doing nothing which may be regarded as a necessary affirmance of an illegal act."

*Hitchcock* v. *Galveston,* 96 U. S., 341, 24 L. Ed., 659; *Chapman* v. *Douglass county,* 107 U. S., 348, 2 Sup. Ct., 62, 27 L. Ed., 378; *Argenti* v. *San Francisco,* 16 Cal., 282; and *Land Co.* v. *Jellico,* 103 Tenn., 320, 52 S. W., 995, all recognize and enforce the principle that a municipality will be made to respond for the value of the benefit conferred upon it, notwithstanding the contract under which the benefit was given and received was unenforceable.

In view of the principle announced by these cases, which seems to be sound both in morals and in law, we agree with the counsel of the complainants that, wherever money is wrongfully received by a municipal corporation from which benefit has accrued to it, it is no

reply to a claim for restitution that the corporation received the money and appropriated it for governmental purposes, but that to the extent of the benefits received, whether in the discharge of its governmental or private duties, the corporation is bound to respond.

It could hardly be insisted that receiving this fund wrongfully, whether as the result of fraud or innocent error upon the part of the municipality, as its portion due either to its schools, or to it in its corporate capacity for their maintenance, and the fund was still in the custody of the city, that it would not be required to make restitution to the complainants. And further, had the city of Knoxville, upon the receipt of this fund from time to time, instead of appropriating it to its public schools, applied it to the building of market houses, or the construction of streets, or to the support of its police or fire departments, it would hardly be contended in such case that it should not be required to make good the sum so received and applied. If this be true, why then is it not equally bound to do this, having used the fund for the very purpose for which it was intended and received, to wit, the maintenance of schools within the corporate limits? What difference in the application of the principle does it make that the board of education, or the enumerators acting for the board, who made the false reports, were the agents of the state (if they were such), if, after all, the city took the benefit of the moneys paid over on these false reports? How can the character of these two parties, one or both, affect the liability of the

city upon the assumption that the city took the benefit ignorantly, or otherwise, of their acts?

But it is said for the defendant that "the department of education of the city is one of its governmental branches engaged in carrying out, for the general welfare of the people, the schools laws of the State." From this, it is insisted, it follows as a corollary that "the city has derived no private benefit or emolument from the funds sued for in this case," and therefore it is contended the principle announced in the cases referred to has no application here.

The constitution of the State, recognizing that "knowledge, learning, and virtue are essential to the preservation of republican institutions," and that the diffusion of the opportunities and advantages of education throughout the different portions of the State would be highly conducive to the promotion of this end, imposed as an express duty upon the general assembly the encouragement of literature and science. As one of the chief means of accomplishing this most important purpose the constitution contemplated the establishment of a common-school system in the State, and provided that the fund, then "known as the common school fund . . heretofore by law appropriated . . . for the use of common schools, and all such as may hereafter be appropriated, shall remain a perpetual fund for the maintenance of the common schools of the State." Article 11, section 12.

From time to time, both before the adoption of the con-

stitution of 1870, and since, various acts have been passed by the legislature to enforce the efficiency of the common schools. In 1873, however, there was enacted a general law, the purpose of which is indicated by its title, to wit: "An act to establish and maintain a uniform system of public schools." Chapter 25, p. 39, of the Acts of 1873. By the second section of the act it was provided that "the public school system thus established should be administered by the following authorities, to wit: State superintendent, county superintendent, and district school visitors."

The effect of this act would possibly have been to wipe out the common school system already organized and operating in the various incorporated towns and cities of the State; but to guard against this section 51 provides that none of the provisions of the act should be construed to interfere with the schools or systems thus established, but that all such schools should receive their *pro rata* shares of moneys raised under the provision of the act according to their scholastic population.

While this section left these schools intact, and with the right to share with the common schools of the State in the funds set apart under the constitution as a common school fund, still it did not make them a part of the system organized under the act. It is true that these municipal public schools are established under the authority of the State, and that for convenience in their management, in many cases the legislature has seen proper to create, by acts of incorporation, boards of edu-

cation to manage and control them, and that there is a reserved power in the State to enlarge or extinguish these boards (*Edmondson v. Board of Education,* 108 Tenn., 562, 69 S. W., 274, 58 L. R. A., 170), yet it does not by any means follow that these schools constitute parts of the system provided for in the act of 1873.

Long prior to 1873 the legislature had incorporated the city of Knoxville, with express power to establish and regulate public schools for the children within its limits.

In 1885 an act was passed by the legislature, entitled "An act to reduce the acts incorporating the city of Knoxville, and the various amendments thereto to one act, and amend the same." Acts 1885, Ex. Sess. p. 48, c. 8. Recognizing the then existence of such schools by sections 63 and 64 of the act it is provided that the board of mayor and aldermen should elect five citizens of the city who are to constitute a board of education, and by the sixty-sixth section that the board of mayor and aldermen should prescribe the duties of this board of education.

It is under the authority of these sections of the charter and ordinances passed in accordance therewith that a board of education was elected and put in charge of the schools of the city, and it was under the authority of this board that enumerators were appointed from time to time to take a census of the scholastic population of the city whose false reports were made the basis of ascer-

taining the *pro rata* of the public school fund of the State to which the city was entitled.

It is a matter of common knowledge that municipal charters are granted at the instance and for the benefit of communities, speaking through the representatives of their citizenship. So it is not going too far to assume that the citizens of Knoxville, realizing that knowledge and virtue were essential elements of good character, and that common schools tended to foster and encourage the growth of both, in order to make the system then existing more efficient had the legislature to provide that it should be administered by a board of public education. This board, however, was not incorporated or in any sense made independent. To the contrary, it was, under the charter, simply an agency designed to accomplish the best results, and was made absolutely dependent on the creator (the city) for all its rules of government.

That the city understood these common schools were a part and parcel of its corporate system, as much so as its fire or police department, the court of chancery appeals find that in the preparation of its annual budgets there was provided for the support of these schools yearly sums equal to the public school fund turned over to it.

We think the charter of 1885 by clear implication recognizes the duty of the city of Knoxville to maintain a system of common schools for the children within its corporate limits, and for the more successful performance of this duty authorized the placing of this system

under the direction of the agency already referred to, acting, however, under the dominion and control of the corporation itself. If, then, it was the duty of the city to maintain these schools, and it did receive from the common school fund of the State a larger *pro rata*, whether the result of mistake or fraud of itself or its agent, than it was entitled to, and appropriated the same, why should it not respond in law for this excess?

The second proposition of the defendant already set out, *in extenso*, may be summarized thus: As the wrong complained of was committed by a subagent of the State—that is, the enumerator appointed by the board of education, an agent of the State, by implication authorized to appoint this subagent—the city cannot, therefore, having already paid out this money, be called upon a second time to do this thing. The principle on which this insistence rests is thus stated by Mr. Mechem in his work on Agency: "If the agent employs a subagent for his principal and by his authority, expressed or implied, then the subagent is the agent of the principal and is directly responsible to the principal for his conduct; and, if damage results from the conduct of such subagent, the agent is only responsible in case he has not exercised due care in the selection of the subagent." Section 196.

The application of this rule to the case in hand depends upon the proper answer to the question, was the board of education, or any one of the census enumerators employed by this board, an agent of the State? We think

there can be but one answer to this question so far as the board of education is concerned. As has been seen, under the charter it is elected by the corporate authorities of Knoxville and is absolutely subject to their control and dominion. The charter confers no power on it, and prescribes no duties for it. This being so, it results necessarily that the members of that board were answerable alone to these authorities for any abuse of the trust imposed upon them.

In addition, the accepted definition of a municipal corporation, we think, excludes the idea of any relationship of principal and agent between the State and this board. In *East Tennessee University* v. *Knoxville,* 6 Baxt., 166, it is said that a municipal corporation is a body corporate established by law to share in the civil government of the country, but chiefly to regulate the local or internal affairs of the city, town, or district incorporated. It would be a strange anomaly, indeed, if the principle stated in the above citation from the text of Mr. Mechem should be held to apply to one occupying the position of census enumerator and thus make him the agent of the State. We think the law to be otherwise, and that the board of education appointed as hereinbefore pointed out, and acting, as this board did, for a municipal corporation clothed, as was the city of Knoxville, with the attribute of sovereignty over the people and property within its territorial limits, was the agent of the city, and that neither it nor its enumerator was in any sense the agent of the State. We think, therefore, the princi-

ple announced by Mr. Mechem has no application to the case at bar.

The court of chancery appeals, disregarding the two contentions of the appellee which we have been considering placed its reversal of the chancellor's decree upon the ground that to grant the prayer of complainants below would work more of mischief than good at this late period of time. On this subject that court says: "The fund having been received and used for educational purposes, can the wrong done the outside children of the county and State be remedied, under our law governing our public school system, without inflicting at this time a greater wrong than the one committed in the first instance? . . . As a matter of fact it is common knowledge that matters of a public nature in similar instances involving the payment and disbursement of moneys raised for the purpose of government, when the transaction has passed to completion, cannot be remedied, although the payment and disbursement inflicted a wrong on certain parties of the public, and whose payment and disbursement would have been averted if it had been sought to do so in the courts before the wrong was completed; and the vital reason is that to remedy by a restoration of the original money status, if it could be done, would result in a greater injury than the original evil. We have been unable to see how the original status can be restored in this case by making the city refund the excess of the school fund it received.

"In the first place, the school children outside the city

limits entitled to the benefit of this excess of the fund turned over to the city, many of them, at least, it is reasonable to infer, are not in the public schools, especially in districts from which the fund was diverted. In the second place, under the view of the writer, when a public school fund is assessed and collected, it is impressed with a trust in favor of the school children of the several school districts in the State and the public schools of its municipalities, and is apportionable to them under the law according to their number in their respective districts. This being so, the school fund leviable each year in the city of Knoxville for the support of the public city schools is impressed with a trust for the educational benefits of its school children of the current school year. In other words, these children are the real beneficiaries of the fund so raised, and we do not believe that they can rightfully be deprived of it because a portion of the fund that should have rightfully gone to the education of outside children was diverted to the schools of the city attended by their predecessors. . . ."

This argument and conclusion rest upon the assumption that to affirm the chancellor's decree, and hold the city of Knoxville for the aggregate sum which, through it, has been wrongfully diverted from the funds held in trust for school purposes, involves the necessity of making good this diversion by appropriating the current revenues of the city appropriated to the support of its schools. We do not understand that this would result.

115 Tenn.—13

A decree against the city for the amount of this misappropriation would be like any other decree or judgment, to be satisfied out of the general revenues or such as may be derived from a tax imposed to meet the judgment itself.

We do not see how any confusion would follow from this holding, or that the school children of the city would be subjected to any deprivation of school facilities by reason thereof.

It follows, from what has been said, that we cannot agree with the reasoning of the court of chancery appeals, or with the decree which it has pronounced. The decree of that court is therefore reversed, and the decree of the chancellor is affirmed, save that the recovery here will be in favor of the State, for the use of the common school fund of the State and county, as their interests may appear on a reference, for the making of which the case is remanded. Interest from the date of the filing of the bill is allowed. The costs of the cause will be paid by the city of Knoxville.