Caldwell, J.
The bill alleges that at the time of the making of the mortgages and notes to Roberts, Roberts and the Demings called on James at his barn; that Roberts told him he was going to prosecute him for perjury; that he was on his way to Ravenna for that purpose; that he had two witnesses who would swear that the statements in his deposition were false, and that unless he would settle with him, he would have to go to the penitentiary ; that he asked for time to consult his family and neighbors; that Roberts refused, telling him that nothing but immediate compliance would save him, and that he might consult the Demings, who were friendly to him; that he, James, did advise with the Demings, who told him he had better settle with Roberts; and that thereupon, being greatly alarmed, he executed the notes and mortgage, for the purpose of saving himself from the threatened prosecution.
The bill also alleges the innocence of complainant from said charge ; and states that in his deposition he only swore to such facts as he well remembered to be true. The bill further states that the consideration paid to Roberts by James, for delivering up the land, was twenty-five dollars, which was paid at the time of the transaction.
*556 The answer denies the principal allegations of the bill. Roberts states that he procured a copy of the deposition of James from the clerk of the court of Trumbull county; that he started in company with the Demings to go to Ravenna for the purpose of instituting the prosecution; that when they got to Charleston, in the neighborhood of where James lived, Freeman Deming proposed that they should go and see James; that he read to him the deposition; that James said it was false, that he had never sworn to it, that he signed it without reading; and that James proposed to settle it, and asked him, Roberts, on what terms he would settle it; that he told James that he could not settle for the state, but that for his own part he would settle ; that James requested the Demings to say nothing about it, and that they shortly after went to a justice of thé peace, who drew up the notes and mortgage, and that James executed them. Roberts states that the consideration of the notes and mortgage arose out of the arrangement he made with James to deliver up to him the land. He says that James agreed to give him seventy-five dollars; that James paid him twenty-five dollars in cash, and that for the remaining fifty he gave him the notes of Robe, amounting to $525 ; that Jenard had brought suit on these notes, and failed, and that he, Roberts, had to pay the costs, which amounted to $83.81; that the fifty dollars on the contract respecting the land, these costs, and the costs and damages which he might afterwards have to pay on account of the false deposition of James, constituted the consideration of the notes and mortgage.
The first inquiry which we propose to make is, whether there was any valuable consideration for these notes and mortgage. This necessarily leads us to examine, in the first place, what was the contract between Robe and -Roberts, in reference to the notes of Robe held by James ?
Susannah Robe, the mother of Isaac Robe, states that Roberts told her that the bargain between him and Isaac, was, that he was to pay twenty-five dollars and keep the notes for Isaac, as they were paid off. She says that after Roberts had sold *557 out to James, and had got from James the notes he held on Isaac, she heard that Roberts was trying to sell the notes, and she went to him and told him what she had heard. He denied it, and said he was about to start south on a peddling tour, and that he would take the notes to Isaac, who then lived in Licking .county.
Seth Oviatt says that Roberts told him, that he was to pay Robe twenty or twenty-five dollars, and clear Robe of the contract, or lift the notes — witness is not certain as to the language. '
James E. Robe states, that shortly after the sale of thwrand to Roberts, when his brother Isaac was about to leave this part of the country, they went together to the shop of Roberts, and his brother said to Roberts : “ You will see old James and get those notes, and stand between me and all harm.” . Roberts said he would.
Seth Oviatt, jr., said he heard Roberts say that he had bought the article for the land, from Robe; that he paid Robe twenty-five dollars for it; that he got a piece of wheat and some wood or saw logs, and that when he got the notes he was to deliver them up to Robe.
Isaac Robe states.that the contract was, Roberts was to pay him twenty-five dollars for the land, and lift his notes.
On the other side, we have the testimony of Asahel E. Goodrich and Horatio Roberts, who state, that at the time the contract was made, Robe said he did not care a damn about the notes, that he had got two hundred dollars worth of timber off the land; and Horatio Roberts says that he, Robe, said he was going away, and did not expect to return. Chancey Richards says that he had a conversation with Robe about the contract. In that conversation, Robe told him he did not care a damn about the notes; Roberts might lift them or not, as he chose.
Here it will be seen are five witnesses on the one side, whose testimony goes directly to prove that the contract was, that Roberts should lift these notes of Robe’s, and save him from all liability on them. On the other side, we have the testimony *558 of three witnesses, whose testimony goes to show that. Robe expressed a perfect carelessness about what should become of the notes; still this evidence is perfectly compatible with his, considering himself freed from all liability on their account. Indeed we think that would be the fair inference from it. We think the direct evidence in the case proves very clearly that the contract between Roberts and Robe was, that Roberts should lift the notes for Robe. But the circumstances of the case, we think, place the matter beyond all doubts. No other understanding in reason could have existed between the parties. Roberts could not get the title to his land without paying off the amount of the notes. Robe, who, from the evidence, is a responsible man, and the owner of real estate, transferred the title bond for the land to Roberts, and put him into possession, leaving the whole of the purchase money unpaid. Now that Robe should sell out his title for twenty-five dollars, and pay the whole of the purchase money for the land, is inconsistent with all our notions of men and things.
The next questipn arising in the case is, what was the understanding between James and Roberts in reference to these notes of Rohe’s, at the time Roberts delivered up to James the land with the title bond, and James delivered up these notes to Roberts ?
The claim of the defendant is, that the contract was, that he was to receive seventy-five dollars from James for deliver ing up the land; that twenty-five dollars was paid in money, and he took these four notes of Robe’s for $525, for fifty dol lars.
The testimony of Susannah Robe, (that we have alluded to above,) is to the effect that he, Roberts, had received these notes, to deliver them over to Isaac Robe.
Seth Oviatt states, that after Roberts had given up the land to James, he had a conversation with Roberts about what he got for it. Roberts stated that James gave him twenty-five dollars; Robert's at the same time remarked that he had had the use of the land.
*559 On the part of the defendant, Horatio N. Roberts, Edward H. Oviatt and Samuel Thomas, state that they were at the house of Roberts when the contract was made, and that Roberts received seventy-five dollars, twenty-five in money, and Robe’s notes at fifty dollars. Here is a direct conflict of testimony. It will be seen that there are three witnesses testifying on the part of the defendant, and two on the part of the complainant. Although the defendant has the advantage so far as the number of witnesses is concerned, yet when we take the other facts and circumstances of the case in consideration, we think the evidence very strongly preponderating in favor of the complainant. That Roberts and James, after the title bond and the land had been delivered up to James, should make these notes of Robe’s, given for the entire purchase money of the land, which Roberts had purchased, and the amount of which, as we before remarked, he was bound to pay before he could obtain his title for the land, and which, if we are right-in our conclusion above, he had contracted to lift, and hand over to Robe, the subject of sale for a valuable consideration is altogether unreasonable. Besides, that these notes, that amounted to $525, with a considerable amount of interest on them, should have been sold for fifty dollars, adds to the improbability of such a transaction. The other theory is the reasonable and consistent one. James received back his land, and the title bond which he had given. He did not pay for the land, he only paid for such interest as Roberts had in it, with all the purchase money unpaid, and he delivered up the notes that embraced the entire consideration for the land under the contract that by this arrangement had been put an end to. If we are right in this, it establishes two important facts in the case : 1st. That the deposition of James, taken in the case of Jenard v. Robe, was true in stating that these notes were merely delivered up by him, and not sold.
And, secondly: That the mortgage and notes given by James to Roberts, and which are sought to be set aside by this proceeding, were made without any pecuniary consideration pass *560 ing from Boberts to James. The next, and only remaining question of fact in the case is, whether these notes and mort gage of James to Boberts, were obtained through fear, occa sioned by threats of Boberts to prosecute James, criminally, for perjury.
Now, we think this appears from the answer of Boberts to have been the case, although he denies it in words. He states that he started that day in company with the Demings to go to Bavenna, for +he purpose of commencing a criminal prosecution ; that one of the Demings, when they had got to Charleston, proposed that they should go and see James; that they went to him, and he read to him the deposition; that James admitted that it was not true, and asked how he could settle, and requested them all to say nothing about it. Boberts’s own answer, as given by himself, shows that he understood James to mean a settlement of the prosecution; he replies, that he cannot settle for the state, for he had no authority to do so; but for his own part, he would settle for one hundred and fifty dollars. They went before a justice, had the writings executed, and Boberts proceeds no further with the prosecution.
Freeman Deming, who was in company with Boberts, says he heard no threats made use of by Boberts towards James, and that neither he nor his brother advised James to settle.
Lyman Deming states, that he was at work with Freeman Deming — that Goodrich Deming came after Freeman, and would have .him to go with him, on particular business, and that they went off together.
Witness states, that he afterwards told Freeman that he had found out what he, Freeman, went for; Freeman said he ad vised James to settle it, as Boberts threatened to send the constable after him.
Abel Fowler states, that soon after the transaction, he told. Freeman Deming that it was no use for him to deny that he advised James to settle it; that Freeman replied that he did not deny that he advised James to settle; that Boberts said he would take him with a state’s warrant if he did not settle.
*561 Alanson Baldwin states, that in a conversation which he had with Roberts, he, Roberts, said that James owed him one hundred and fifty dollars, and if he did not settle with him, he would prosecute him, or sue him, or take him up for a false oath; that if James did not settle with him, he would make a wood chuck skin of him before he got through with him.
A majority of the court, who sit in this case, are of opinion that the evidence shows that the consideration of the notes and mortgage, was to stop the threatened prosecution by Roberts..
The question then presents itself, Can the court grant relief in such a case ? It is contended on the part of the defendant, that the court cannot grant relief; that the contract is opposed to sound morals and public policy, and that the court will not move in the matter, but leave the parties where it finds them. Numerous authorities are cited to sustain this position, amongst others the case of Raguet v. Roll, 4 Ohio Rep. 419. In that case, it appeared from the plea, on the averments of which the court made the decision, that Raguet agreed that he would not only not prosecute, but that he would use his influence to prevent a prosecution, and that he would not appear as a witness against the accused.
The court considered this contrary to public policy. They say: “ Whenever an agreement appears to be illegal, immoral, or against public policy, a court of justice leaves the parties as it finds them; if the agreement be executed, the court will not rescind it; if executory, the court will not aid in its execution.” This is no doubt a well established principle, but we do not think it applies to the present case. A majority of the court are of opinion that James was entirely innocent of the crime charged against him, and that this was known to all parties concerned; that the charge was got up merely for the purpose of extorting money from him by operating upon his fears, and that fearing the consequences of the prosecution, notwithstanding his innocence, he executed the notes and mortgage.
*562 He is proved, by a great number of witnesses, to be a very weak and cowardly man, and a number of remarkable instances .are given of the effect of fear on him. Cowardice is a great defect of character, but where a party is compelled through fear to do acts which are only calculated to injure himself, they have never, in the legal sense of the term, been regarded as immoral or contrary to public policy. A true public policy requires that all groundless prosecutions should, if possible, be prevented, and that every facility shall be afforded to the innocent to escape from such a calamity; and we think an innocent party may, with great propriety, ask to be relieved from the consequences of a groundless charge.
There will be a decree for the complainant.
Hitchcock, 0. J., having been of counsel, did not sit in this case.