ANTHONY PETZ ET AL. v. THE CITY OF DETROIT.

*95   169*
*'s116   565*

*Police power—Municipal corporations—Markets—Authority to discontinue—Rights of tenants.*

1. The authority to establish and regulate markets falls within the police power of the State, and may be conferred upon municipal corporations, which cannot abridge, bargain away, or impair it by contract.
2. The right of the city of Detroit to discontinue the use of certain land in said city, and of the buildings thereon, for market purposes, and to devote the land to another public use, regardless of the terms of tenants occupying stalls in said market, is affirmed.

Appeal from Wayne. (Brevoort, J.) Argued February 15, 1893. Decided March 10, 1893.

Bill to restrain the city of Detroit from interfering with the occupancy by complainants of stalls in the Central Market. Defendant appeals. Decree reversed, and bill dismissed. The facts are stated in the opinion.

*Robinson & Barlow,* for complainants.

*John J. Speed,* for defendant.

McGrath, J, This is a bill to restrain the city of Detroit from interfering with the occupancy by complainants of stalls in the Central Market.

The bill sets forth that since 1806 the city of Detroit, by virtue of its charter provisions, has always maintained a central public market; that in July, 1848, a portion of Michigan Grand avenue was vacated for the purposes of a public market; that in August, 1848, the common council set apart the space so vacated as a public market; that ever since that time such space has been occupied with buildings used for market purposes; that—

"In 1879 the city constructed a new market building on the site of the Central Market, between Bates street and the Campus Martius, at a cost of nearly $50,000, with a basement, and above it three stories, the lower one to be occupied for a meat-market, and the second and third ones by offices, halls, and court-rooms; which said building is still standing, and occupied for the purposes aforesaid. The space before mentioned between Bates and Randolph streets has been, from the time of the location of the market on said street as aforesaid, occupied as a vegetable and fish market, and is so occupied at the present time."

That the public markets of said city are governed and controlled by ordinance; that said ordinance declares the space so vacated and occupied as aforesaid, with others therein, to be public markets, and contains the following provisions:

"Sec. 2. The city controller and the committee on markets shall recommend, and the common council, in the month of February of each year, shall establish and grade, the minimum rent to be paid per month upon all the meat stalls and vegetable and fish stands in the public markets. It shall be the duty of the controller, on or before the first day of April in each year, to lease to responsible and proper persons all stalls and stands which may be applied for, for the term of one year from said April 1, but no stall or stand shall be leased at any time at a rent below the minimum established by the common council. Any

stall or stand which shall not be so rented on or before the fifth day of April may at any time be rented by the controller to any responsible person for a period not extending beyond the first day of April of the following year. No person shall be allowed to rent more than one stall or stand. (As amended September 25, 1888.)

"SEC. 3. All rents of stalls or stands in the public markets of the city shall be paid monthly in advance; and each lessee shall, with one or more sureties, to be approved by the controller, enter into a lease with the city of Detroit, conditioned for the payment of rent in the manner herein provided, and for the faithful observance and subject to the penalties of the provisions of this and all other ordinances relative to the public markets of the city.

"SEC. 4. The controller shall deliver to the clerk of the Central Market, and to the officers in charge of the other markets, a monthly roll of the amounts due for rents to the city from persons occupying stalls and stands in the public markets, and it shall be the duty of the clerk and such other officers to collect the same promptly."

That complainants have been occupants of certain stalls (naming them) for many years; that prior to 1885 "complainants entered into written leases with said city of Detroit, as provided for in said ordinance, but since the year 1884 no such lease has ever been made or requested to be made by them, or either of them;" a copy of which is annexed.

"Complainants aver that their tenancy is now, and always has been, a tenancy from year to year; that they have always paid the rent agreed upon in advance, and have in no way violated any of the terms or conditions of their said leases or of the said ordinances; that on or about April 1, 1892, said Fitzpatrick Bros. paid to the market clerk of said city the sum of $360, being the rent of said stall No. 16 for the year ending March 31, 1893, which was accepted by said market clerk, who gave a receipt to said Fitzpatrick Bros. for the same; that said Anthony Petz and said John Glynn, on or about April 5, 1892, paid the said market clerk the amount of their monthly rental of said stalls for the month of April, 1892, and on or about May 5, 1892, the monthly rental of said stalls

for the month of May, 1892.   *   *   *   Complainants aver
that the occupancy of their respective stalls, as aforesaid,
continued after the 31st day of March, 1892, and up to
the 31st day of May, 1892, without any notice to them of
any intention on the part of said city to terminate their
said leases before the expiration of the year ending March
31, 1893, and with the full expectation and belief that
they would continue in the peaceful enjoyment and occu-
pancy of the said premises for that period of time, and they
paid their rent with that expectation and belief."

That at a session of the common council held February
16, 1892, the following resolution was offered and referred
to the committee on markets:

"*Resolved,* That the market clerk be, and the said mar-
ket clerk is hereby, directed to not receive rents for the
stalls in the Central Market building now occupied by the
butchers only until June 30, 1892."

That on March 29, 1892, said committee reported to
the council that—

"We are of the opinion that it would be injudicious to
advocate the removal of the Central Market at the present
time, as the same cannot be removed until the bonds are
canceled; and, as no one has appeared before your commit-
tee to advocate the removal of the same, we are unable to
see why the revenue derived from the rental of these stalls
should be stopped at the present time.   Your committee
further believe that the council have no power to act in
the matter before the bonds are canceled."

That the said report was adopted by the council; that
at the same meeting of the council the committee on
markets and the controller reported a schedule fixing the
rents of stalls in the Central Market, to take effect April
1, 1892; that said report was laid upon the table; that on
April 19, 1892, at a meeting of said common council, the
last-mentioned report was taken from the table, and the
following resolution was offered as a substitute:

"*Resolved,* That all stalls and stands in the Central

Market shall be occupied under a lease from the city for one year, the rental of the same to be paid monthly in advance, and the leases shall be given under the express condition that the same may be terminated at any time upon one month's written notice from either party to the lease; and, further, that the following schedule for the rental of stalls and stands for the ensuing year be, and the same is hereby, adopted."

That such substitute was adopted; that at a meeting of the council held April 26, 1892, the controller reported the rents collected by the market clerk, including those paid by complainants as aforesaid; that said report was referred to the committee on ways and means, who reported to the council at a meeting held May 3, 1892, that the said amounts had been collected without authority, and recommended that said amounts, less accrued rents, be returned; that said report was adopted, and by resolution warrants were ordered drawn in favor of said parties for the amounts so paid, deducting from each the rent that had accrued; that at a meeting of said council held May 24, 1892, the following preamble and resolution was adopted:

" *Whereas,* As all the stalls and stands in Central Market are occupied under a lease from the city for one year from April 1, 1892, upon the express condition that such leases may be terminated at any time, upon one month's written notice from either party to the lease; and

" *Whereas,* The city of Detroit, one of the parties to such lease, is desirous to terminate all such leases at the earliest possible moment after July 1, 1892:

" Therefore be it *Resolved,* That the city controller be, and is hereby, directed to serve a written notice on behalf of the city of Detroit upon each and every occupant of a stall or stand in said Central Market that leases of such stall or stand will be terminated at the expiration of one month from the date of service of such notice.

" And further *Resolved,* That the market clerk be, and is hereby, instructed to receive no rent for such stall or stand for any term or terms after service of such notice by the city controller."

That notices in accordance with the terms of said

resolution were served upon complainants; that at a meeting of said common council held June 28, 1892, the following ordinance was adopted:

"SEC. 1. That the squares and spaces of ground in the city of Detroit, 50 feet in width, between the east line of Campus Martius and the west line of Bates street, and between the east line of said Bates street and the west line of Randolph street, with the buildings thereon situated, heretofore used for market purposes, and known as 'Central Market,' be, and the same are hereby, vacated as a public market, and the further use thereof and the grounds and buildings thereon for such market purposes is hereby discontinued; and that said grounds and lands upon which the buildings are located be, and the same are hereby, set apart and dedicated as a public park, such dedication to take effect as soon as the buildings thereon are removed.

"SEC. 2. All ordinances and parts of ordinances inconsistent with the provisions of this ordinance are hereby repealed.

"SEC. 3. This ordinance shall take effect on the 1st day of July, A. D. 1892."

That at the same meeting the following resolution was offered, but objected to, and laid over:

"Resolved, That the board of public works be, and they are hereby, directed to tear down and remove, as soon after the 1st day of July as possible, the buildings and sheds located on the strip of land 50 feet wide between the Campus Martius and Randolph street, known as the 'Central Market Building;' the expense of the same to be paid for out of the contingent fund."

"Complainants aver and show unto the court that, as appears by paragraphs preceding, they, together with the lessees of the stalls in said Central Market, are in peaceable possession of the same as tenants of the said city of Detroit for the term of one year, beginning April 1, 1892, and ending April 1, 1893, and that the said city cannot rightfully or lawfully remove them from the same, or disturb them in their peaceable tenancy of the same, during that period; that they have relied upon their right to occupy said premises for the period aforesaid, and that they cannot now find other places of business at this season of the year, suitable for their market business; and

that their trade, which it has taken them many years to establish, will be utterly and wholly destroyed if said buildings are torn down, and their places of business taken from them."

The answer, omitting the formal parts, is as follows:

"1. It admits the allegations alleged in said bill in relation to the establishment of the Central Market, the construction of the Central Market building in 1879, the averments of complainants relative to ordinances of the city in relation to markets; that the complainants are respectively occupants of stalls in the Central Market building, which was erected, as stated, in 1879; that, when they went into the occupation of said stalls, leases were respectively made to them of their said stalls, as alleged in complainants' bill.

"2. Defendant further admits the proceedings of the common council on the 16th of February, 1892, the 29th of March, 1892, the 19th of April, 1892, the 26th of April, 1892, the 3d of May, 1892, the 10th of May, 1892, the 24th of May, 1892, and the 21st of June, 1892, as alleged in the sixth and seventh paragraphs of said complainants' bill.

"3. This defendant also admits the adoption of the ordinance on the 28th day of June, 1892, abolishing the Central Market, as alleged in the eighth paragraph of said bill; and it also admits that Alderman Schehr, at the session of the council held on the 28th of June, 1892, offered a resolution, a copy of which is set forth in said eighth paragraph.

"4. This defendant avers that the bonds issued by this defendant, known as the 'Central Market Bonds,' and from the sale of which the money was raised to construct the Central Market building, have all been paid, as provided by the act of 1875, authorizing the construction of said building and the issuing of said bonds.

"5. That the ordinances relative to markets contain other provisions than those set forth in complainants' bill, and this defendant refers to the whole of said ordinance, and prays that the same may be taken as part of this answer to said bill.

"6. This defendant avers that the leases of the stalls made to said complainants are alike in form, excepting as to date, amounts, and name. This defendant attaches hereto, as part hereof, a copy of the lease made by the city controller on be-

half of the city to said complainant Anthony Petz. It prays: leave to refer to the same, and to the other market leases of the other complainants when produced and proved.

"7. It avers that the sums mentioned in the report of the committee of ways and means made to the common council on the 3d of May, 1892, and mentioned in the resolution of Alderman Lowry, offered at the same meeting, and adopted by the council on the 10th of May, 1892, were tendered to the respective named parties mentioned in said report and resolution by the city controller, after the adoption of the said resolution, and said named persons refused to receive the same. Said tender was made before the filing of said complainants' bill, and on or about the 1st of June, 1892.

"8. This defendant avers that the ordinance abolishing the Central Market   *   *   *   has become operative, and this defendant insists that the said market has ceased to exist as such, as provided by said ordinance, and the rights of the complainants to the occupation of stalls in said Central Market became and were terminated.

"9. This defendant avers that it has established, with the necessary buildings and appurtenances, two other markets, known as the 'Eastern' and 'Western' markets, and the common council have determined that the further continuance of the Central Market is no longer necessary, and accordingly adopted the ordinance abolishing the same; and the common council might lawfully thereupon adopt the resolution offered by Ald. Schehr, directing the board of public works to tear down or remove the building, as provided by said resolution."

The case was heard on bill and answer, and a decree entered for complainants, from which defendant appeals.

The case of *Cooper v. City of Detroit*, 42 Mich. 584, disposes of several important questions raised by this record. That was a bill filed by owners of property abutting on Michigan Grand avenue to restrain the erection of the building the destruction of which the present proceeding is brought to enjoin. The strip of land herein referred to as having been vacated in 1848 extends from the east line of the Campus Martius to the west line of Randolph street, except that Bates street divides it into two sections. In *Cooper v. City of Detroit* it was set up that in 1834

the first building erected on said premises extended from the east line of the Campus Martius 80 feet eastward; that the lower portion of said building was occupied for market purposes from the time of its completion until 1849, and the upper portion was occupied as a city hall; that in 1849 a frame addition was built in the rear of said first-named building, which was used for market purposes, and the first-named building was thereafter used exclusively as a city hall; that in 1855 the frame structure was torn down, and a separate brick building was built in the rear of the city hall building first named, and a space left between the two buildings; and that in 1872 both buildings were torn down. It was therefore insisted that the vacation made in 1848 was for market purposes; that, such market purposes having been abandoned, the land was restored to the highway; that the city had had no such continuous occupation of that portion of said premises lying west of Bates street as would create title in the city; and that, the vacation having been for market purposes, the city had no right to erect the present building, which it was proposed to use in part for a court-room and city offices.

The Court held that, where any part of a highway has been extinguished, and turned to other uses, it must be renewed with the same methods of dedication or user which would turn other lands into public highways; that, where a highway is vacated conditionally, it is not re-established by the suspension of the conditional occupation; that, inasmuch as the charter did not require the purpose of the vacation to be expressed, nor make such expression obligatory on the subsequent occupation, the expression of the specific purpose in the proceedings to vacate was surplusage; that the occupation of land by a city for market purposes is not a public easement, but a proprietary occu-

95 MICH.—12.

pation; that the statute of limitations had long since made the city's title impregnable; and that, where the right of a city to certain property has been established by the statute of limitations, specific allegations that its use for a specific purpose that is not unlawful will have a bad effect on the neighboring property can have no bearing on the proceedings to enjoin its use therefor. It will be observed that in that proceeding the right of the city to use these premises, in part at least, for purposes other than market purposes, came directly in question, and the Court held that the city's interest in the property was a proprietary interest, and that the city might devote the property to any of its needs.

*Attorney General v. City of Detroit*, 71 Mich. 92, does not conflict with the former decision. In that case the city undertook to abolish the only city market, and that, too, before the bonds issued under the law of 1875 had been paid. In the present case the city has not attempted to abolish markets, but, having established an Eastern and a Western market, has determined that no necessity exists for the continuance of the Central Market. Having paid the bonds issued under the act of 1875, that objection does not now exist. Clearly the rights which Mr. Justice CAMPBELL aimed to preserve in *Attorney General v. Detroit* were rights which had been acquired by the public in view of the exercise by the city for a long period of years of the market franchise. It was there expressly held that, while the city could not capriciously destroy markets, it might change their location. The exercise of the right to remove involves the existence of markets.

It cannot be seriously contended that either actual or imaginary local or individual interests are to be considered in the exercise of the right to change the location. It appears by this record that the city has more than once exercised this right, and that the Central Market existed

by reason of a removal from some other locality. The power to change locations would be an empty one if subject to the whim or caprice of individuals.

The power of removal has been generally recognized as incident to the grant of the right to establish. The population and centers of population in our large cities shift from one locality to another. The course of trade frequently transforms a residence locality into a business district. The right must be co-extensive with the benefit sought to be conferred. To confine the market to a place to which the population cannot conveniently resort would tend to defeat the very purpose of the grant. The only mode of fixing the location is by a reference to the convenience of those who are the objects of the grant, and the common council only can fix and determine the most convenient locality.

As is said by Black, C. J., in *Wartman v. Philadelphia,* 33 Penn. St. 202, 210:

" The right to establish a market includes the right to shift it from place to place when the convenience or necessities of the people demand it. This was decided in 1817, by the court of king's bench, in *Rex v. Cotterill,* 1 Barn. & Ald. 67, a case very much like the present. If the English law, saturated as it is with conservatism, and particularly hostile as it was at the time to everything which might change the old customs of the boroughs, had regard enough for the public necessities and convenience to adopt this rule, it will hardly be rejected here, where changes are so rapid, improvement so necessary, and the prejudice against reform so slight. It would be fastening a strange imbecility upon the government of an American city to decide that it shall not have new market-houses, whatever may be the need of the people, without also maintaining old ones, after they become useless." *Dixon v. Robinson,* 3 Mod. 108; *Curwen v. Salkeld,* 3 East, 538; *Wortley v. Local Board,* 21 Law T. (N. S.) 582; *City of Jacksonville v. Ledwith,* 26 Fla. 209 (7 South. Rep. 893); *Gall v. Cincinnati,* 18 Ohio St. 563.

The only other question that remains to be considered

is whether these complainants, as tenants, have acquired any interests which entitle them to block the exercise of this power of removal by the common council. In order to make the holding over of a tenant effective as creating a new tenancy, there must be either the express consent of the lessor, or some act from which his consent may be implied. It is well settled that an implied promise cannot be raised against a corporation where, by its charter, it can only contract in the prescribed way, except it be a promise for money received or property appropriated under the contract. Dill. Mun. Corp. § 459; *McSpedon v. Mayor, etc.*, 7 Bosw. 601; *McCracken v. San Francisco*, 16 Cal. 591; *Pimental v. San Francisco*, 21 Id. 351; *Dickinson v. Poughkeepsie*, 75 N. Y. 65. There is no charter provision in the present case, but the ordinance, which has for some purposes all the force and effect of a statute, expressly provides how and in what manner a yearly tenancy may be created. The ordinance certainly cannot be invoked to fix the terms and conditions of a tenancy which was not created under its provisions. While it may be true that the council might, by some affirmative action directed to that end, create a yearly tenancy, although the method prescribed by the by-law were not pursued, yet it is a matter of grave doubt whether, in the absence of affirmative action expressly contemplating that purpose, a yearly tenancy could be created, except by action under the provisions of the ordinance.

But it is unnecessary to rest the present case upon that ground. The authority to establish and regulate markets falls within the police power of the states, and the right to exercise such authority may be conferred upon municipal corporations. The police power cannot be abridged, bargained away, or impaired by contract. Complainants' tenancy, whether from year to year or from month to month, was subject to the exercise by the common council

of the power of removal vested in that body.  *Gale v. Kalamazoo*, 23 Mich. 344; *City of Jacksonville v. Ledwith*, 26 Fla. 163; *Railroad Co. v. Richmond*, 26 Grat. 83, 96 U. S. 521; *Beer Co. v. Massachusetts*, 97 U. S. 25; *Stone v. Mississippi*, 101 Id. 814; *Presbyterian Church v. Mayor*, 5 Cow. 538; *New Orleans v. Stafford*, 27 La. Ann. 417.

It follows that the decree of the court below must be reversed, and the bill dismissed, with costs of both courts to defendant.

LONG and GRANT, JJ.; concurred with McGRATH, J.

HOOKER, C. J., and MONTGOMERY, J., concurred in the result.