CITY OF DETROIT v. DETROIT CITY RY. CO. et al.

(Circuit Court, E. D. Michigan. January 31, 1894.)

No. 3,320.

1. HORSE AND STREET RAILROADS—VOID ORDINANCE—ESTOPPEL.

A grant, by ordinance, to a street-railway company, was extended, by subsequent ordinances imposing new obligations, to a period beyond the limit of the corporate life of the company. The franchises of the company were thereafter transferred in turn to two different corporations, whose charters did not expire within the term of the extended grant. *Held,* that the extended grant was void upon the ground that it could not exceed the normal life of the original company, and that the enforcement of new obligations, discharged at great expense by the new companies, would not estop the city, in view of statutory restrictions, from denying a grant in the streets by any other act than an ordinance "duly enacted for the purpose." How. Ann. St. Mich. § 3548.

2. SAME.

An ordinance, imposing new obligations, extended a grant beyond the limit of the corporate life of a street-railway company. *Held,* that such ordinance constituted a valid, subsisting contract during the term of the corporate life of such railway company, and that the city was not thereby estopped from asserting the right to oust the grantee of such railway company (whose charter did not expire within the term of the extended grant) from the occupation of the streets after the expiration of such term.

In Equity. Suit in the circuit court of Wayne county, Mich., by the city of Detroit against the Detroit City Railway Company, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company of the City of New York, for an injunction to compel the removal of tracks from the streets, and to restrain respondents from operating a street railway therein. The Washington Trust Company of the City of New York removed the cause to this court, and a motion to remand was thereafter denied. 54 Fed. 1. A motion by complainant to postpone the hearing on bill and answer, or to dismiss the complaint, was also denied. 55 Fed. 569. The cause was afterwards heard on bill and answer, and the injunction was refused as to certain lines of rails, and a further hearing ordered in respect to the remaining lines (56 Fed. 867), which hearing is now accordingly had.

C. A. Kent and Benton Hanchett, for complainant.

Russell & Campbell, Brennan, Donnelly & Van de Mark, Henry M. Duffield, Otto Kirchner, F. A. Baker, Ashley Pond, and Sidney T. Miller, for defendants.

Before TAFT, Circuit Judge, and SWAN, District Judge.

v.60F.no.2—11

TAFT, Circuit Judge. This is a suit in equity, brought by the city of Detroit for an injunction to compel the Detroit Citizens' Street-Railway Company to cease the running of its cars, and to remove its railway tracks from the streets of the city. The cause was heard on bill and answer in the spring of 1893, and every question was then decided save one. This the court reserved for further argument, and gave leave to the parties to amend their pleadings, and to introduce evidence in respect to it. The case is fully stated in the opinion of the court at the former hearing, reported in the fifty-sixth volume of the Federal Reporter, page 867. For the better understanding of the question now to be decided, however, it is necessary to state again the main facts of the case, and to give a brief synopsis of the previous decision.

On November 24, 1862, the common council of Detroit granted to certain persons about to secure incorporation under the laws of Michigan as the Detroit City Railway a right to construct and operate a street railway in the streets of the city, on certain conditions, for the term of 30 years from the date of the ordinance. The Detroit City Railway was accordingly organized on May 9, 1863, with a corporate life, limited, as required by the incorporating statute, to 30 years. It accepted the terms of the ordinance, and built and operated the railway as authorized. On November 14, 1879, the common council passed another ordinance, which imposed new and different obligations on the railway company with respect to taxes, new liens, and other matters, and extended the grant of 1862 for 30 years from November 14, 1879. By ordinances of 1887 and 1889, the obligations of the railway company in respect to taxes, rates of fare, and the extension of lines were again varied, and the new grant of 1879 was confirmed. The railway company accepted in writing the ordinances of 1879, 1887, and 1889, on the faith of the grant of 1879. In December, 1890, the Detroit City Railway conveyed all its property and franchises to the Detroit Street-Railway Company, a corporation newly organized for 30 years from that date. After operating the railway until October, 1891, this company in turn conveyed all its property and franchises to the Detroit Citizens' Railway Company, another new corporation, organized for 30 years from September, 1891. The last-named company has operated the street railways received by it from its predecessors until the present time, and is the principal defendant against whom relief is sought. On March 29, 1892, the common council passed an ordinance in which, after reciting that the ordinance of 1879 was beyond the power of the common council passing it, in so far as it purported to extend the grant beyond the corporate life of the grantee, the ordinance was amended by limiting the operation of the grant to May 9, 1893, the day when the corporate life of the grantee the Detroit City Railway must end.

At the hearing upon the bill and answers four questions were presented, argued, and decided.

The first and most important was whether the grant until 1909 was valid. The holding of the court was that the city had no power to grant a vested right in its streets except as it was conferred in

the statutes of Michigan providing for the incorporation of street-railway companies, and limiting their corporate lives, in accordance with the Michigan constitution, to 30 years; that the function of the city, as defined by those statutes, was nothing but a consent, with such conditions as the city might impose, to the exercise by the duly-incorporated railway company of its state-given franchise to construct and operate a street railway in the streets of the consenting city; that by the rule of strict construction in favor of the public, enjoined upon courts in interpreting the meaning of grants of power to municipal corporations, the consent of the city could not be of longer duration than the franchise, the exercise of which was to be consented to; and that, inasmuch as such a franchise was limited in duration to the normal life of the railway company upon which it had been conferred by the state, the city's power of consent to its exercise was similarly limited. It was therefore decided that the ordinance of 1879, in so far as it purported to give the right to the railway company to occupy the streets after May 9, 1893, was beyond the city's power as a grant, and was not binding.

The second question was on a plea of res judicata, which needs no notice here except to say that the plea was not sustained.

The third question was presented on defendant's objection that, if the ordinance of 1879 was ultra vires, then the city was seeking relief from its own wrong, and, as the parties were in pari delicto, a court of equity would leave them where it found them, and dismiss the bill; and the case of St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393, 12 Sup. Ct. 953, was cited to sustain the point. It was held that the rule relied on did not apply; that the common council, in the valid exercise of legislative power, had revoked the license of the railway company to remain in the streets after May 9, 1893; that thereafter the use of the street by the street-railway company, being unauthorized, became a nuisance; and that the public, for whom the city, in its control of the streets, acted merely as trustee, could not be denied the ordinary equitable remedy for abating a nuisance, because a common council, years before, had assumed to bind the public by a longer grant than it had power to make. It might well have been added that the principle invoked by defendants has application only where a court of equity is asked to aid a wrongdoer, as, for example, one who has entered into, and partially or wholly executed, a contract which is ultra vires because its execution is an offense against the law, or a plain contravention of public policy (Thomas v. Richmond, 12 Wall. 349; St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393, 395, 12 Sup. Ct. 953), or one who has made and entered upon the execution of an ultra vires contract with the deliberate intention of evading the known limitations of the law. Common Council v. Schlich, 81 Mich. 405, 45 N. W. 994. It does not apply to a case like the present, where parties in entire good faith, with no intent to violate law or public policy, but by reason of a common mistake of law, make a contract, a stipulation of which is not binding to its full extent,—not because it is immoral or unlawful or against public policy, but simply for want of statutory power in the stipulating

party.    In such a case, to use the language of Mr. Justice Mathews, "the policy of the law extends no further than merely to defeat what it does not permit, and imposes on the parties no penalty." Chapman v. County of Douglas, 107 U. S. 348, 356, 2 Sup. Ct. 62.

The fourth question was one of estoppel.    It was contended by the defendants that the city was estopped to assert the invalidity of the grant until 1909, because, on the faith of it, the defendants have invested very large sums of money in repaving the streets between the tracks, in relaying tracks, and in extending new lines on the demand of the city authorities, and also in equipping its lines with electric motive power.    It was held that, as the railway company was charged with a knowledge of the city's powers, no estoppel could supply a want of power, and that the defense was bad.

In discussing this question it was suggested by the court that the averments of the answers somewhat obscurely raised another and a different question of estoppel, growing out of the transfer of the property and franchises of the old company to the new companies.    The new companies had corporate lives extending beyond 1909, and there was no want of power in the city to confer a grant of that duration upon them.    The question was this: If the city enforced against the new companies obligations created by the ordinances of 1879, 1887, and 1889, and not contained in the ordinance of 1862, and these obligations were discharged at great expense by the new companies on the faith of the extension of the grant until 1909, would this constitute a confirmation by the city in pais directly to the new companies of the invalid grant of 1879?    As the question had not been argued, a further argument was ordered, with leave to amend the pleadings and take evidence upon the point reserved.    The pleadings were accordingly amended, the question has been argued, and is now to be decided.

The first objection made to the claim of estoppel is that under the laws of Michigan a municipal corporation cannot be estopped to deny a street-railway grant.    It is contended that the only way of securing such a grant from the public is by ordinance, duly enacted for the purpose as prescribed by statute, and that this prevents an estoppel by matter in pais.    Counsel for defendants suggest that the question made by the objection does not arise here, because the ordinance of 1879 was enacted for the purpose of making the grant until 1909, and all that now has to be shown is a ratification or recognition on the part of the city by matter in pais of that ordinance.    It is said that when the new companies took possession the city was under a duty to elect whether it would go on under the ordinance of 1879, or that of 1862, and that a failure to elect, and acquiescence in the ordinance of 1879, bound the city to all its terms.    I cannot concur in this view.    The grant from May 9, 1893, to 1909, has been held to be not voidable, but void.    There can be no ratification of a void act by mere acquiescence.    The defendants, in order to sustain this defense, must show conduct of the city equivalent to a new grant, or rather conduct estopping the city to deny a new grant.    The void grant may be used as evidence to characterize and show the meaning of the city's conduct towards the new compa-

nies, relied on as constituting the estoppel, but it cannot be used to supply to such conduct any lack of formality which the statute may make indispensable in a new grant.

Another suggestion with the same purpose is that the grant, though void as such, may be considered a standing offer to make a grant, good until withdrawn, to any assignee of the original grantee, whose corporate life should be long enough to give the city power to make the grant. This is said to be justified by the form of the grant, which is "to the Detroit City Railway and assigns." As the offer was not withdrawn, and the new companies who have entered into possession and discharged their obligations under the ordinance of 1879 have thus accepted it, it is now said to be binding as a contract in the form of an ordinance of the city duly enacted for the purpose. I do not think this ingenious argument can be supported. The grant until 1909 purported to be a binding grant, and was intended to be; but beyond May 9, 1893, it was void. How can it be changed into a standing offer to grant when it is not so framed? It is true that succeeding councils were charged with a knowledge of its void character, but how could they recognize it as a continuing offer to grant, binding on them unless withdrawn by them? Where is there any authority in one council to make a standing offer of a street railway grant running for 15 years? The use of the words "and assigns" in the grant was simply a recognition by the council making it of the statutory right of the grantee to assign the grant, and of the fact that if the grant was to be enjoyed after May 9, 1893, it must be by an assignee. It is manifest, therefore, that the question whether an estoppel can be asserted against the city to deny a grant when there is no grant by ordinance duly enacted for the purpose cannot be avoided in the ways suggested, and must be now considered.

Section 3548, c. 95, How. Ann. St., a part of the law under which the new companies are incorporated, is as follows:

"Any street railway corporation organized under the provisions of this act may with the consent of the corporate authorities of any city or village given in and by an ordinance or ordinances duly enacted for that purpose, and under such rules, regulations and conditions as in and by such ordinance or ordinances shall be prescribed, construct, use, maintain and own a street railway for the transportation of passengers in and upon the lines of such streets and ways in said city or village as shall be designated and granted from time to time for that purpose in the ordinance or ordinances granting such consent; but no such railway company shall construct any railway in the streets of any city or village until the company shall have accepted in writing the terms and conditions upon which they are permitted to use the streets."

In this section are defined the conditions precedent to the enjoyment of a street-railway franchise in the streets of a city. Having regard to the rule of strict construction in favor of the public, for whose benefit manifestly these conditions were imposed, it is reasonable to believe that the provision of the section as to how the consent shall be granted was intended to be mandatory. Grant by ordinance was doubtless required because it was thought that the time and formality necessary in passing an ordinance would be more apt to secure that care and deliberation of the council and

the mayor so essential to the public interest in framing this important contract. The words "duly enacted for the purpose" have much significance, for they indicate the legislative intent that the municipal authorities shall know what they are doing when they make a street-railway grant, and were used for the very purpose of preventing such a grant by an ordinance which has not the grant for its expressed object. The words have an effect like that of the frequent requirement in state constitutions that the purpose of a bill shall be expressed in its title, and should be construed, as that requirement generally is, to be mandatory. The question next arises whether such a mandatory restriction as to an express grant prevents a court from holding a city to be estopped by matter in pais to deny a grant.

Where a city has received money or appropriated property under a contract which is beyond its power, courts have frequently required the city to restore the money, or to reconvey the property, or even the reasonable value of the latter, on the ground that it cannot retain that which it received under a contract, and at the same time repudiate the contract. Under ultra vires contracts, however, it is only where there is the receipt of money, or the taking of property, that courts can afford such relief against municipal corporations. The general rule is that, where an express mode of creating a liability against such a corporation is prescribed by statutes, no liability can be enforced, and no estoppel can be raised against it, on the ground of the acceptance of benefits or other conduct which would render an individual liable. Petz v. City of Detroit, 95 Mich. 169, 180, 54 N. W. 644; Dill Mun. Corp. § 459, and cases cited. The reason is that the mode of contracting prescribed limits the power of contracting, and no implication or estoppel from circumstances can supply a want of power. If this rule applies, as it does, to all contracts made by a city acting as an individual in its proprietary capacity, how much stronger must its application be where the city, as a trustee for the public, and in a quasi governmental capacity, is exercising a limited and restricted right to make a private grant in the streets. It is much more difficult to imply a liability or to raise an estoppel against the city in respect to the highways intrusted to its care than in matters where the city acts as full and complete owner. Dill. Mun. Corp. § 675. And while Judge Dillon is of the opinion (in which he is supported by many authorities) that an estoppel may be asserted against a municipal corporation to defeat its attempt to oust persons asserting private rights in a public street, he says that such cases are exceptional, and must depend on their own peculiar circumstances. But nowhere in this valuable work does he intimate, and no authority has been cited which holds, that a municipal corporation can be estopped in pais to deny a grant in the street to a railway corporation or other person when the statute prescribed for the corporation a particular mode of making the grant.

Let us examine the cases cited for the defendants upon this point. In the case of Spokane St. Ry. Co. v. City of Spokane Falls,

decided by the supreme court of Washington, and reported in 33 Pac. 1072, a street-railway company, with authority under an ordinance to lay its track on certain streets, laid part of it on a street not included in the ordinance, with the knowledge of all the city officials, and without objection on their part, and under the direction of the superintendent of streets. The line upon this ungranted street was operated for more than two years without objection, and taxes were levied and collected on the property. It was held that the city was estopped to claim that the right to maintain the track on the street was not authorized by it. In that case the city charter provided that contracts should be made only by ordinance, and it was objected to the claim of estoppel that, as the grant to the city railroad was in the nature of a contract, the right to maintain a street-railway track in the streets could arise in no other way than by the provisions of an ordinance. After referring to this clause of the charter, the court said:

"But it is evident from the reading of that entire section that the contracts therein intended are those which would bind the city to the payment of money. The general rule would, of course, be that franchises of this kind could not be acquired except by the action of the corporation, which must be taken by ordinance. But the statute in question does not prohibit the court from declaring an estoppel against the city in other matters in the same manner as they would in the case of private persons."

It is clear from this language that the court held that a street-railway grant was not within the section requiring contracts of the city to be made by ordinance, and therefore that there was no restriction on the mode of making the grant.

Chicago, R. I. & P. R. Co. v. City of Joliet, 79 Ill. 25, was a bill in chancery to restrain the operation of a steam railroad over certain streets in the city of Joliet to the public square. It appeared that the steam-railroad company, for upwards of 22 years, had occupied the streets from which, by this bill, it was now sought to exclude it. The city was held estopped in pais to prosecute the action. The occupation had begun before there was an incorporated village, with the express permission of the county commissioners, and under an implication of authority from an act of the legislature; and it did not appear that the mode by which the city of Joliet could confer such an easement in the streets was restricted by its charter. In Chicago & N. W. R. Co. v. People, 91 Ill. 251, the authorities of the city acquiesced for 19 years in the use of a public street by the railroad company in maintaining an arch over the street, and had made an agreement in writing with the company, whereby the right to so use the street had been recognized as continuing until it should be necessary to rebuild the arch. It was held that the city, by these acts of recognition and acquiescence, was estopped from compelling the company to remove the arch and obstruction until it should become necessary to rebuild the same. It did not appear by what arrangement the company had originally built the arch, but the court presumed that some arrangement had been made which was satisfactory to the parties. The report of the case does not show that the exercise of the power of making a grant in the streets was limited by the

city's charter to any particular mode. In each of the Illinois cases it will be seen that there was something very like an express grant from public authorities at a time when they were competent to make it.

In New Orleans v. N. Y. Mail S. S. Co., 20 Wall. 387, the authorities of New Orleans appointed by the military government established during the late Civil War had made a lease for 10 years of one of the city wharves to a steamship company, which had spent much money in improving the leased premises. Some time after the occupancy began, and before the term ended, the general commanding turned the city over to a regular civil government, and a suit was brought by the city to oust the company. The decision of the court against the city, concurred in by four judges, was put upon the ground that it was within the power of the military authorities to make a lease for 10 years. There was also an intimation that perhaps the lease could be sustained on the ground that by receiving one installment of rent the civil government of the city had ratified the lease. Justice Hunt concurred in the judgment of the court only on the ground of ratification. Judge Field dissented. It is doubtful whether this can be considered a relevant authority, for it would seem that the city acts with respect to wharf property more as a private landlord. In view of the division of the court, it is hardly authoritative on the subject of ratification by estoppel. But, even if it is, there is nothing in the case to show that there were any restrictions different from those applicable to private individuals upon the mode in which the city government could make a lease of its wharf property.

For the reasons given, I am of the opinion that the statutory restriction upon the mode by which the city can make a street-railway grant precludes me from holding the city estopped to deny a grant in the streets by any other act than an ordinance duly enacted for the purpose.

Concede that I am wrong in this view, however, and let us consider the acts which in this case are said to estop the city to deny that it has made a grant to the new companies until 1909. The first is that the city required the Detroit Street-Railway Company, in the spring of 1891, to relay its tracks, and repave between the tracks, on Jefferson avenue between Woodward avenue and Second street, when that part of Jefferson avenue was being regraded and repaved by the city. This entailed upon the railway company an expense of $12,000. Under the ordinance of 1862, the Detroit City Railway agreed, whenever the city should repave, to relay its tracks and repave between them and 2½ feet on each side thereof, the city to furnish the material. By the ordinance of 1879 this provision was changed, so that the railway company agreed to pave between the tracks, and to pay for the material. The requirement that the company should furnish paving material, it is said, could only be based on the ordinance of 1879, and was, therefore, a complete recognition of that ordinance as defining the mutual obligations existing between the city and the new companies, giving life to all its parts, including the extension of the grant until 1909. It appears, how-

ever, by an examination of an ordinance approved July 8, 1873, that the Detroit City Railway was given authority to construct and maintain a double track on Jefferson avenue, on the express condition that whenever the city should pave or repave that avenue the company would pay all the expenses, including that of material, for repaving between the tracks and two feet and nine inches outside of the outer rail of each track. It would therefore seem that the company, in repaving Jefferson avenue, and relaying its tracks thereon, was complying with an obligation in force under the grant of 1862, the burden of which had been reduced, rather than increased, by the ordinance of 1879.

Another act of the city, relied upon by the defendants, is the reception of taxes by the city from both the new companies. The ordinance of 1862 imposed an annual license fee upon the railway company of $15 per car, and, in addition, there was a provision in the street-railway act imposing an annual state tax of one-half of 1 per cent. upon the paid-in capital of every street-railway company. In the ordinance of 1879 the city license was changed from $15 per car to 1 per cent. of the annual gross receipts of the company. In 1882 the legislature of Michigan repealed the clause of the tram-railway act imposing a tax of one-half of 1 per cent. on the paid-in capital, and this brought the railway companies under the general tax laws of the state. Thereupon the city attempted to impose general taxes upon the personal and real property of the railway company. This was resisted, and the litigation resulted in a compromise ordinance of 1887, which provided that the railway company, in lieu of all taxes to be collected by the city, should pay the same tax as that assessed upon individuals on its real estate, and should also pay $1\frac{1}{2}$ per cent. upon its gross receipts until 1897, and 2 per cent. thereafter until 1909. Subsequently the city attempted to collect taxes upon the personal property of the company, and the supreme court of the state held that the city had precluded itself from doing this by the stipulation of the ordinance of 1887. From this history of the litigation it would seem that the provision with respect to taxes in the act of 1887 was a shield for the company, rather than an imposition of a new burden. There was no provision in the ordinance of 1862 that the license of $15 per car should be in lieu of all taxes to be assessed by the city. Payments of taxes under the ordinance of 1887, when without that ordinance the city might have assessed higher taxes, could hardly be made the basis for an estoppel to support a grant.

Another act of the city, relied on, is a resolution of the common council in August, 1891, directing the Detroit Street-Railway Company to proceed immediately to lay a double track on Gratiot avenue from its then terminus to the easterly city limits. By the ordinance of 1879 the old company was required to extend its track on Gratiot avenue from Chene street to the city limits within such time as the council might by resolution declare to be necessary. Under the ordinance of 1889 it was required to lay a double track whenever the city should repave that part of Gratiot avenue. It thus appears that in directing the construction of this double track

the common council was enforcing an obligation imposed upon the Detroit City Railway by the ordinances of 1879 and 1889, and was recognizing those ordinances, and that the railway company made a substantial investment because of the action of the council. It does not appear that the mayor signed this resolution, but, as he was required by law to approve all resolutions and ordinances involving the city in future pecuniary liability, we may infer that he signed the resolution or ordinances approving the contracts for the improvement of Gratiot avenue which made this resolution necessary. It would seem, therefore, that the city authorities who were authorized to pass express grants to railway companies took part in the proceedings by which the railway company was required to lay the double track on Gratiot avenue.

Another act of the city which is said to have been a recognition of the ordinance of 1879 was the resolution of the council of April 26, 1892, directing the railway company to repave Woodward avenue between its tracks while the city was repaving the rest of the street. At an expense of $133,000, the company did this repaving, and put in new rails. Again, on June 7, 1892, the common council by resolution approved a contract of the board of public works for the repaving of Gratiot avenue, and the board of public works notified the street-railway company of the city's intention in this regard. The company accordingly relaid its entire track, and paved between the tracks, and furnished the material therefor. The total cost of the work was $60,000. As already stated, under the ordinance of 1862 the railway company was obliged to pay all the expense of relaying the tracks, repaving the streets between the rails, and two feet four inches outside thereof, except the cost of the paving material. Therefore the additional burden put on the company by the ordinance of 1879 was the difference between the cost of the paving material used between the rails and the cost of paving four feet eight inches of the street, exclusive of the material. To the extent of this difference the acts of the city in compelling the Citizens' Company to do the work done in repaving Woodward avenue and Gratiot avenue was a binding recognition by the city of the ordinance of 1879. What the difference was is nowhere definitely stated, but we may assume, for the purpose of this decision, that it was a substantial sum.

Another transaction relied upon by the defendants as the basis for an estoppel is the expenditure by the company, which the city permitted and supervised, of $250,000, to equip the Jefferson and Woodward avenue lines with electric motive power. The authority to do this was conferred upon the company by the ordinance of 1889, which in terms reaffirmed the extension of the grant by the ordinance of 1879. The expenditure by the company was voluntary. There was no affirmative action on the part of the city, except that it provided the inspectors to secure compliance with the ordinances of the city in regard to the manner of placing the electric plant upon the streets. This action of the city was an acquiescence in the validity of the ordinance of 1889 in conferring authority upon the railway company to use electricity in the opera-

tion of its railways, but the act of the city could hardly be said to be an enforcement of the obligations of the ordinance of 1879, or any amending ordinance. It ought to be mentioned here that the expenditure of $133,000 on Woodward avenue, of $60,000 on Gratiot avenue, and of $250,000 in equipping the Woodward and Jefferson avenue lines with electricity, was all subsequent to the ordinance of the city declaring that the rights of the company in the streets would end May 9, 1893, and was in the face of that declaration.

Another, and the last, act of the city which I shall notice, was the passage by the common council of the ordinance February 4, 1893, requiring the Detroit Citizens' Street-Railway Company to sell what were known as "workingmen's tickets" on their cars, and imposing a penalty for the failure to do so. By section 8 of the ordinance of 1862 it was provided "the rate of fare for any distance shall not exceed five cents in any one car or on any one route named in this ordinance." By the ordinance of 1889, which reaffirmed the extension of the grant contained in the ordinance of 1879, it was provided that between the hours of 5:30 and 7 in the morning, and between the hours of 5:15 and 6:15 in the evening, passage should be furnished upon tickets to be sold at the rate of 8 tickets for 25 cents. These were known as "workingmen's tickets." The tickets were voluntarily sold by the new companies at stations along the lines. The ordinance of February 4, 1893, was passed to compel the sale of these tickets upon the cars. The company refused to obey, and was prosecuted criminally at the instance of the city, and was fined $300. After the validity of a similar ordinance against another company had been sustained by the supreme court of the state, the company acquiesced, and sold the tickets on the cars.

I was at first inclined to the opinion that the provision in the ordinance of 1862 as to fare was a limitation upon the company only, and would not prevent a reasonable regulation of the fare by the common council, under section 19 of the same ordinance. The argument of counsel for the company, however, has convinced me that I was wrong, and that in the provision of section 8 in the ordinance of 1862 there is a necessary implication, binding as a contract on the city, that the company may, if it chooses to do so, charge five cents for each fare. It therefore follows that the obligation upon the company to sell tickets at the rate of 8 for 25 cents for passage during any hours of the day was a change in the stipulations of the ordinance of 1862, and an additional obligation and burden upon the company, imposed by the ordinance of 1889, which expressly reaffirmed the grant until 1909. It is clear, therefore, that the ordinance of February 4, 1893, compelling the sale of workingmen's tickets, was a recognition by the city of the ordinance of 1889, and the strongest affirmation that it had the right to enforce against the new companies the obligations of that ordinance. It may also be mentioned that under the ordinance of 1889 the old company was required to furnish transfer tickets entitling a passenger on one fare to ride on two routes, whereas, under the

ordinance of 1862, a single fare paid for a ride on a single route, and no more. The new companies continued the system of transfers without question, and have issued an average of 10,000 a day while operating the railways. But it would be difficult to make out any affirmative action on the city's part towards the new companies in regard to transfers as a basis for recognition by estoppel of the ordinance of 1889.

I have now at tedious length examined all the acts of the city which are said to constitute the estoppel asserted in this case. Do they do so? There is no doubt that acts have been shown in which the city has affirmatively recognized clearly and in the most emphatic manner that the ordinance of 1879 and succeeding ordinances were binding on the new companies. Was this a recognition and affirmance of an existing and binding grant until 1909, in all respects like that purporting to be made in the ordinance of 1879? It certainly was if the ordinance of 1879 was rendered void in all its parts by the invalid extension, for in such case the new companies would have acquired from the old company rights and liabilities in the streets fixed under the ordinance of 1862, and the recognition of obligations under another ordinance, wholly void; and the enforcement of them could only be consistent with and referable to a new grant in all respects like that of the void ordinances.

The act of the city in compelling compliance with the conditions of such a grant would confirm it in all its length and breadth. A substantial expenditure by the new street-railway companies in yielding to such compulsion would be a sufficient basis to create an estoppel against the city to deny its existence. It becomes of controlling importance in this discussion, therefore, to determine the effect of the invalidity of the extension until 1909 upon the ordinance of 1879. After much consideration, I have reached the conclusion that, while the extension beyond May 9, 1893, was void as a binding stipulation upon the city, the ordinance, as a contract, was only voidable. It may be true that the extension was the chief consideration for many of the obligations assumed by the railway company, but the ordinance, as a contract, was workable as such until May 9, 1893, and it had, in effect, been carried out as long as the Detroit City Railway remained in possession. As already stated, there was no offense against the law or contravention of public policy in carrying out the ordinance. Its provisions were not void because of any unlawful or immoral consideration. The disability of the city to bind itself beyond May 9, 1893, entitled the railway company to rescind the contract contained in the ordinance, and to be restored to its former position, so far as might be, under the contract of 1862; but, until rescinded by the company, the contract in the ordinance of 1879 must be regarded as an existing contract, enforceable as far as the law would permit. It seems to me that the case in this respect is very like the case of Chapman v. County of Douglas, 107 U. S. 348, 2 Sup. Ct. 62. In that case the complainant had in good faith, under an honest mistake as to the county's powers, sold and conveyed 160 acres of land to a county

in Nebraska in consideration of $8,000,—$2,000 in county warrants, and the balance in four equal annual notes of the county commissioners, at 10 per cent. interest, secured by mortgage. It was beyond the power of the county to buy the land except for cash in hand, or upon an agreement to pay as the state of the county treasury would permit, and the notes and mortgage were void, and of no effect. It was held that the vendor might waive the invalid terms of the contract, and receive his money at such times as the county should be able to pay it from ordinary assessment of taxes; or that, after waiting a reasonable time, he might rescind the contract because of the disability of the county to comply with all its terms, and compel the county to reconvey the land.

In the case at bar, the City Railway, or either of its successors, might have rescinded the contract embodied in the ordinance of 1879, and the company's acceptance thereof on the ground of the city's disability to make the grant until 1909; but until such rescission the contract was binding on both parties. The effect of the rescission would have been to restore the parties to the ordinance of 1862, and to relieve the companies of the heavier obligations of 1879. It is true that the case cited differs from the one at bar in that the court there was able to restore to the complainant his property, title to which had passed to the county, whereas here the benefit conferred upon the city by the investments of the railway company was of an indirect character, upon which it would have been impossible for a court to place a pecuniary estimate. Hedges v. Dixon Co., 14 Sup. Ct. 71, 72. But this difference does not affect the bearing of Chapman v. County of Douglas upon our present inquiry, which is whether all of the ordinance of 1879, except only the extension beyond May 9, 1893, was existing and in force as a contract when the new companies took possession of the street railway. For the reasons given, this inquiry must be answered in the affirmative.

The case of State v. Town of Harrison, 46 N. J. Law, 79, is apt to mislead, and needs explanation upon this point. It there appeared that the city council of the town of Harrison had made by ordinance a contract for 20 years with a water company for a water supply, when, under the statute, there was power in the council to make only a 10-years contract; and it was held that the excess vitiated the whole proceeding, and that the void part could not be severed from the good. At first blush, the case might seem to be on all fours with the one at bar, but an examination of the exact question which was before the supreme court of New Jersey shows it to have no application here. The proceeding was supervisory. It was a writ of certiorari, brought to directly review the action of the common council in making the contract. The contract was wholly executory, and the question presented to the court was whether at that stage it should say that what purported to be the contract of the city for 20 years was a lawful contract for 10 years, when, if the council really wished to make a contract for 10 years, it could do so then, when everything was still in the future, and no one had been led to change his position by the first ordinance. The

question which arises at the bar is in reference to a contract which has been carried out by both parties for more than one-half of its term. Where contracts which contain a void stipulation have been entered into in good faith through a mutual mistake of law as to the power of the stipulating party, and have been partially or wholly executed, they are recognized as existing, and as binding the parties, as far as the same are enforceable, until rescission. Chapman v. County of Douglas, 107 U. S. 348, 2 Sup. Ct. 62; City of East St. Louis v. East St. L. Gaslight & Coke Co., 98 Ill. 415; City Council of Montgomery v. Montgomery Water Works Co., 79 Ala. 233; City Council of Montgomery v. Montgomery & W. Plank-Road Co., 31 Ala. 76; Water, Light & Power Co. v. Carlyle, 31 Ill. App. 325; Decatur Gaslight & Coke Co. v. City of Decatur, 24 Ill. App. 544; Nebraska City v. Gas Co., 9 Neb. 339, 2 N. W. 870.

It is not claimed that there was a rescission of the contract of 1879 by either of the railway companies; on the contrary, each company insisted that it was in full force in all its parts. Assuming that I am right in regard to the invalidity of the extension of the grant beyond May 9, 1893, it must follow that there was a contract in force, securing to the company rights in the streets until May 9, 1893, and no longer, which imposed on the new companies all the obligations of the ordinances of 1879, 1887, and 1889. None of the acts which we have examined went further than to affirm the binding character of the obligations upon the company under the ordinances of 1879, 1887, and 1889. They were not inconsistent, therefore, with a grant expiring May 9, 1893, and could not estop the city from asserting its right to oust the Citizens' Street-Railway Company from its occupation of the streets after that date. The question which was reserved for further argument must be answered, as all the others have been, against the claims of the company. It was my first impression, as it was my hope, because of the great hardship of the case, that the point reserved would enable the defendant company to escape the effect of my former rulings; but further consideration has brought me to a different conclusion.

As I have said, this is a hard case for the railway company, but the particular hardship should not blind us to the very great importance of a strict construction of all municipal grants in favor of the public, and the great danger of departing from sound rules of law to meet a special case. Of the $500,000 expended by the new company, all but $20,000 was spent after the city, in the solemn form of an ordinance, had declared its intention to insist on the invalidity of the grant beyond May 9, 1893. In this expenditure, therefore, the railway company acted in the confident belief that the grant of 1879 was valid in spite of the claim of the city. It has seemed to me that the company was in error. My Brother SWAN vigorously dissents from my view. It is quite likely that he is right, and that I am wrong, but, meeting the responsibility which the law imposes on me, I must hold that the complainant in this bill is entitled to the relief prayed for, except with reference to the grants now owned and used by the Detroit Citizens' Street-Railway Company, which were conveyed to the Detroit City Railway Com-

pany by the Congress & Baker Street Railway Company and the Cass Avenue Street-Railway Company, and which will not expire until 1907 and 1909, respectively. As to these, the prayer for relief is denied. The prayer of the cross bill that the ordinance of March 29, 1892, be declared null and void, and that the city be enjoined from taking any action thereunder is denied, except as to the two grants above excepted, and in respect to them the relief is granted.

Let a decree be entered making findings as above, and enjoining the Detroit Citizens' Street-Railway Company from occupying the streets of Detroit with its railway tracks except on the lines of the Congress & Baker Street Railway Company and the Cass Avenue Street-Railway Company, and from running their cars thereon after three months from the entry thereof, and enjoining the city of Detroit from taking any action under the ordinance of March 29, 1892, to interfere with the operation of the Congress & Baker Street Railway Company line or the Cass Avenue Street-Railway Company line by the Detroit Citizens' Street-Railway Company. The costs will be taxed to the defendants. I have given three months to the defendant railway company for a compliance with the decree, because, if the tracks are to be removed, that is not an unreasonable time for the purpose. Moreover, it will afford some opportunity for an adjustment of this controversy, which it is to be hoped will result either in a new grant to the defendant company, reasonable in its terms, or the sale of the plant on an appraised value to any new company who may operate the old lines. In expressing such a hope, I assume that the municipal authorities will be influenced by considerations of municipal honor, and will not, for the immediate pecuniary benefit accruing to the city or the public, take unconscionable advantage of the position in which this decree puts the street-railway company; and that it will be seen to be, as it certainly is, for the ultimate benefit and reputation for integrity and fair dealing of the city of Detroit that a compromise be made with the company, enabling it to secure an adequate return for the large cash investments which it has made, in entire good faith.

In view of the division of the court, and the magnitude of the interests involved, this case will, of course, be taken, as it ought to be, to a reviewing court. It can be heard in the court of appeals in May next, and an early decision had. Upon the company's giving bond in the sum of $10,000, conditioned in the usual form, the decree may be superseded, and the operation of the injunction will be stayed pending the appeal.

SWAN, District Judge. For reasons given in my former dissenting opinion in this case, filed June 1, 1893, I dissent from the reasoning and conclusions of the circuit judge in the foregoing opinion.