WlRDMAN, J.
On demurrers of plaintiff to answers of the Bellefontaine Bridge & Iron 'Company-, and others.
T-liis case is, as I understand, one of a number instituted in Sandusky and other counties involving questions of great importance to the public and to persons and corporations dealing with the counties through the officials of the latter.
The actions are brought under the powers understood to be conferred by Bevised Statutes, 1277, as now amended. This section authorizes prosecuting attorneys to institute actions in the name of the state to restrain any contemplated misapplication of county funds, or the completion of any illegal contract, or to recover back, for the use of the county, public moneys already misapplied or illegally drawn out of, or withheld from, the county treasury, or to r.eeover, for the benefit of the county, any damages resulting from the execution of any such illegal contract.
The plaintiff here, suing the Bellefontaine Bridge & Iron Company- and certain -of its agents, seeks to recover, in separate causes of action, moneys of the county paid through said agents to said bridge and iron company.
*305 It is claimed that these moneys were paid as the consideration for the constructing and furnishing to said county of certain bridges by said bridge and iron company pursuant to attempted contracts fraudulently and illegally entered into by some of the commissioners of said county with said bridge and iron company; that the bridges were so paid for at a price more than double their real value; that the transactions were fraudulent as between said company and said commissioners and illegal by reason of non-e m;:lhnee with the statutory requirements of Ohio as to such contracts.
Demurrers to the petition were overruled by another judge of this court, and his opinion is found reported in 2 N. P.—N. S., 373.
The questions now before the court arise upon demurrers to the answers of the bridge and iron company and S. M. Fronizer and N. V. Elliott, its agents.
It'is claimed in behalf of said defendants that the petition is defective calling for no answer, and that as the demurrers to the answers search the record, they should be overruled for that reason.
The question of the sufficiency of the petition having been passed upon by another judge of this court, I should be reluctant to hold the petition insufficient, whatever might be my personal views; but it is perhaps unnecessary at present to discuss the question as to whether the decision made upon the demurrers to the petition was correct or otherwise, in view of the fact that the answers now attacked deny all averments of fraud contained in the petition, and substantially allege that the claimed non-compliance with statutory requirements was inadvertent rather than willful. The answers also deny that the price of said bridges was excessive; deny all damages to the county or the plaintiffs and affirmatively allege matters of claimed defense.
As by the demurrers to these answers the plaintiff admits all of the material allegations of said answers to be true, quite a different case is presented for the consideration of the court from that involved in the hearing of the demurrers to the petition.
Only one of the acts or omissions mentioned in the petition, as constituting non-compliance with the law and thereby invalidaf *306 ing the bridge contracts, is conceded by the answers. That one is the- alleged lack of the auditor’s certificates required by Revised Statutes, 2834b—certificates as a pre-requisite to the making of such contracts, that the money required' for the payment of the obligations was in the treasury or levied and in process of collection.
At the outset of my inquiry I find the question of the constitutionality of this section, raised by counsel for one of the defendants, a question of vital importance; for if the statutory requirement of an auditor’s certificate is itself invalid, this attack on the bridge contracts must fail.
This statute is one of wide scope, embracing within its terms contracts not only of county commissioners, but of township trustees and boards of education of certain school districts. It is insisted, however, that broad as it is, it does not operate uniformly throughout the state, and hence violates the constitutional provision as to acts of a general nature. It is said that in express terms it excepts from its operation cities of a certain class and certain grades.
This court has up to this time, in common with other courts, treated the act as valid; and I am not aware that it has heretofore been assailed. Probably its supposed uneonstitutionality has been suggested by the recent judicial overthrow of other legislation containing somewhat similar restrictions as to operation.
My impression of this particular act is that the restrictive clause refers to school boards and not to county commissioners; that it is only the transactions of boards of education of any school district “in cities of the first class,” etc., that are exempted from the operation of the statute. Why the exception, it is perhaps not worth while now to inquire. Nor is it necessary to determine whether or not the act is in any wise invalidated by thfis clause. It is enough for the present case to hold that even if unconstitutional as to school boards, it does not follow that it is so as to county commissioners. My judgment is, that the act is valid in its application to transactions such as those in question in this action.
*307 Assuming the constitutionality of the statute requiring the auditor’s certificate, and in view of the concession in the answer demurred to, that no such certificates were filed before the making of the contracts with the bridge company, the contracts were, one and all, void by the terms of the act. No rights accrued to either bridge company or county by virtue of the written stipulations. If suit had been instituted by the county commissioners before the construction of the bridges for specific performance or damages, or by the bridge company after construction for the contract price as stipulated, no recovery could have been had. The courts would have left both parties where it found them. The contracts, if void, were non-enforceable upon the petition of either party.
Up to this stage of the inquiry the law is settled. The courts have definitely decided that a void contract can not be made the basis of an action. Equitable rights may arise between parties to the transaction, which may be enforceable, but not by virtue of enforceable provisions of the supposed contract.
.Not only has our Supreme Court very definitely held in Buchanan, Bridge Co. v. Campbell, 60 Ohio St., 406, that a contract made by the commissioners for a bridge, in violation or disregard of the statutes is void, so as to preclude recovery on such contract, but also that no recovery can be had against the county as upon an implied contract for the value of such bridge. It is forcibly said by Judge Burket, who delivers the opinion, that “to allow such a course would permit the evasion of the statutes. * * * The commissioners can not purchase supplies upon the reasonably worth plan, and no one is permitted to deal with them on that plan. The statute is the only authority and guide for both parties.”
This decision was rendered in 1899, but the ease presented was based upon transactions occurring prior to the amendment of 1898 to Revised Statutes, 1277, the, amendment authorizing prosecuting attorneys in the name of the state to recover moneys illegally drawn from the county treasurer, or to recover, for the benefit of the county, “any damages resulting from the execution of any such illegal contract. ’ ’
*308 It appears that notwithstanding the rule obtaining prior to 1898, the courts will no longer leave the parties “where they have placed themselves and refuse to aid either. ’ ’ Before the act was amended, both the bridge companies and the counties were left where the companies on the one hand and the officers of the counties on the other, had placed them. Both were impotent to undo the consummated illegal act or avoid its results.
The amendment of 1898 is designed to restore to a public treasury what has been taken from it by the unauthorized act of public officials, or to make good to the public any damage which it has sustained from the execution of an illegal contract. To this extent at least it is remedial. Whether or not it is also so severely penal as to punish parties who enter into unauthorized contracts, with the loss of whatever thing of value was delivered to the public under such contract, is the question in this ease which has received most attention from counsel.
Before considering this important question, however, it is proper that I pay some attention to a contention of the defendant bridge company, asserted in its answer by way of defense and urged also in the other answers. It is averred in substance that the validity of the claims of the bridge company has been duly passed on by the board of county commissioners, in their capacity as a legal tribunal, empowered to consider and allow or reject claims against the county; and that their allowance of the claims presented by this company was such an adjudication of the matter as will preclude further inquiry.
It is also urged as further defense that the principle of voluntary payment applies; that, as the bridges were voluntarily paid for, the company can not be compelled to return the money.
‘ As to this last mentioned claim, it may suffice to say that if well founded it might in many cases be subversive of the statute of 1898, under favor of which the present action is brought. If the fact that an unauthorized payment from county funds is voluntarily made by its custodian, or voluntarily consented to by the other officials representing the public, will defeat its recovery back by any other representative expressly authorized by statute to take up the county’s cause and by legal proceeding *309 procure the restoration of the money to the publie treasury, the statute must in many, probably most, cases, become ineffective. Such was surely not the legislative intent. My judgment, in view of the statute, is that it is not a matter of consequence that the payment was a voluntary one.
I feel equally clear that the contention of the bridge company that its claims were legally adjudicated and allowed by the board of commissioners, so as to preclude further inquiry, can not prevail. As in the case of the other defense, to sustain it would be subversive of the statute. To hold that commissioners, who even in their collective capacity can not make a valid contract, without obeying statutory requirements, may conclusively allow claims under contracts invalid for non-compliance with such requirements, would seem inconsistent and unreasonable. But I am not left in dependence upon my own judgment that the position taken by counsel is unsound. The Supreme Court has several times considered the effect of allowances of unauthorized claims by county commissioners. In Jones v. Lucas Co., 57 Ohio St., 189, the court held:
‘ ‘ The board of county commissioners represents the county, in respect to its financial affairs, only so far as authority is given to it by statute. It may pass upon and adjudicate claims against the county for services in a matter, which, under the statutes, may be the subject of a legal claim against the county. But it is without jurisdiction to entertain or adjudicate claims which in themselves are wholly illegal and of such a nature as not to form the subject of a valid claim for any amount. And an attempt by the board to allow a claim of such character will not bind the county. ’ ’
Judge Spear, on page 214, says in his opinion: ‘ ‘ The demand being one which may form the basis for a claim, the commissioners may fix the amount; it is the amount only which they determine;” and on page 215, touching the application of the statute as to appeals from such allowances, he suggests that neither the claimant nor the commissioners would appeal from an allowance of the claim and adds: “So that, if the commissioners should entertain a demand wholly unfounded in law, and allow it, and their action upon such unfounded claim should *310 be treated as final unless appealed from, the people’s money would be gone and they without remedy.”
The ease just cited, Jones v. Lucas Co., is approved and followed in Higgins v. Logan Co. 62 Ohio St., 621; Richardson v. State, 66 Ohio St., 108, 113; and Vindicator Ptg. Co. v. State, 68 Ohio St., 362.
In Richardson v. State, supra, Williams, C. J., in his opinion, page 113, uses this language:
“It is further contended in behalf of the plaintiff in error, that the allowance of his claim by the board of commissioners, upon the certificate of the prosecuting attorney and approval of the probate judge, is equivalent to a judgment of a competent court upon the legality and merits of the claim, and, no appeal having been taken therefrom, is a bar to an action to recover the money back. .Such an allowance, when no illegality appears on the face of the claim, may be sufficient to justify the treasurer in its payment, unless it is paid with knowledge of its infirmity otherwise obtained, but it can not operate to protect the person who unlawfully received the money, nor to deprive the county of its right to recover back the money when it has been unlawfully obtained from the treasury.”
The case of Vindicator Ptg. Co. v. State, supra, like the case at bar, was, in its inception in the lower court, an action by the state to recover public moneys drawn from a county treasury. Spear, J., says, page 368:
“As held in Jones v. Lucas Co., the power of the board to act at' all does not exist where in law a demand has no legal basis upon which to stand. ’ ’
Counsel for the bridge company, in the course of an elaborate and able brief, attempt to meet Vindicator Ptg Co. v. State, supra, by an argument that it is not analogous to the ease at bar; that the claim in that case allowed by the commiissioners was not based on contract, or “in a matter on which the commissioners could contract at all. ’ ’
I find myself, however, unpersuaded that the principles enunciated by the Supreme Court do not apply to the case before me. Here, as in Vindicator Ptg. Co. v. State, supra, was a demand which had “no legal basis on which to stand,” and in such ease, *311 as asserted by Judge Spear, “th'e power of the board to act at all does not exist.-”
I am confirmed in my judgment that the decision of the commissioners in allowing a claim based on an illegal and void contract is no more effective as an adjudication than an allowance of an invalid claim of any other kind, by añ examination of an earlier decision of the Supreme Court, State v. Yeatman, 22 Ohio St., 546. In that case a writ of mandamus Was sought to compel payment of a claim against Hamilton county-, a claim for services performed under a contract with the commissioners. Although the commissioners had passed upon and allowed the claim, the court held that the contract was void for non-compliance with statutory requirement and the writ was refused* While the precise question of estoppel by adjudication was not expressly presented in the Yeatman case, it would seem to have been necessarily involved.
The plea of res judicata in the case before me i's presented by each defendant in what is called a “second defense.” The demurrers to this defense will be sustained for the reasons and upon the authority already stated.
The claim that the payment by the county was a voluntary one, and that that fact stands in the way of its recovery from the defendants by the county, is as I have indicated, in my judgment, untenable. The claim is, however, so blended in the answers with other important averments as not. to constitute an independent and complete assertion of defense, and consequently can not be disposed of on demurrer.
Thus far I have considered contentions somewhat technical iu their character; but averments of facts apparently more substantial and calling for the most careful and serious'consideration, are set forth in the first defense of the answers of defendants, Elliott -and Fronizer, and* the third defense of the bridge company. The bridge company’s answer contains no first defense, so numbered, all allegations preceding the “second defense,” which has been disposed of, being merely matter of admission or denial of averments in the petition.
The statements in the answers of defendants, Elliott and Fronizer, -as to the necessity of repairing Or -constructing *312 bridge for the safety of public travel, I do not deem material. While it was the duty of the commissioners to keep county bridges in reasonably safe condition, they were not, because of any alleged condition of such bridges, justified in ignoring the statutes prescribing their duties as to new construction or repair. If bridges, by reason of decay or other cause, had become unsafe, the commissioners might properly close them to travel until such time as, pursuant to law, they could be put into safe condition or new structures could be substituted. But I have been cited to no statutory provisions giving permission to commissioners to dispense with the auditor’s certificate, because of any emergency demanding prompt action in letting bridge contracts.
But in the so-called third defense of the bridge company’s answer and the first defense of those of the other defendants, are allegations varying in form, but alleging in substance not only the absence of any fraud on the part of said company or its agents, and not only the voluntary execution of the contracts by the parties, but also that the county, while seeking the return of the money to its treasury, retains in its possession and control the fruit of the illegal transaction—the structures for'which the money was paid, asserted to be worth the full purchase price. It is alleged by the bridge company that no offer has ever been made by the county to relinquish such possession and control. The defendants, Elliott and Fronizer, allege that in the furnishing of the bridges, as agents of the bridge company, at the same times the contracts were entered into, they were led to believe by the said commissioners and did believe that all the provisions of law had been complied with and that the contracts were binding upon the parties thereto.
All these claims of the defendants must be taken as conceded by the demurrers, and the vital question for my consideration is whether, under such circumstances, where, without fraud, without intentional disregard of law, a bridge company has parted with valuable property surrendering the same to the public, and through its agents has received a stipulated price therefor, such company- can be forced to return that price without either offer of relinquishment of the property by the public or order or de *313 cree of the court for such relinquishment. This question is not answered by the adjudications to which reference has hereinbefore been made, and I am not advised that the Supreme Court of Ohio or any of the lower state courts have as yet passed upon it.
The statute of 1898, amending Section 1277, authorizes the recovery of moneys “illegally drawn or withheld from the county treasury,” and also “any damages,” caused by the execution of an “illegal contract.” The defendants contend with much earnestness that the second of these remedies is the only one applicable to the case at bar; that the first was designed to compel the restoration to the treasury of moneys illegally taken therefrom, where no contract was involved; as, for instance, illegal fees paid to an official, without consideration therefor in the way of property of value delivered to the county. The argument in support of this construction is forcible and I have been much impressed with it; but I am not sure that it is not in a measure met by reasoning in the opinion of Judge Burket in Buchanan Bridge Co. v. Campbell, supra. If the county can recover only such “damages” as are the result of the illegal contract, does that not involve the charging it, in order to measure the damages sustained, with the full value of the bridges as against the price paid? This would practically result in a purchase on what Judge Burket calls the “reasonably worth plan,” a plan not contemplated, at least before the amendment, by the statutes. Whether the Legislature, in enacting the amendment of 1898, contemplated so important a departure from the previous policy of the law may well be doubted.
If, however, this contention of the defendants as to the construction of the amendatory act, is untenable, it can not be disputed that the amendatory act of 1898 abrogates the rule of long standing recognized and enunciated in Buchanan Bridge Co. v. Campbell, supra, that the courts will leave parties to illegal contracts where it finds them. In this case, illegal and void •contracts were made and on both sides executed. The company delivered the bridges; the county paid the price. The amendatory statute says that the price shall be returned, It does not *314 say what shall become of the bridges, the title to which has not passed to the public by any valid sale.
If the county were an individual, authorized by statute to recover his money from any person or corporation to whom it had been paid by an unfaithful or careless servant, although the statute might be silent as to the disposition of any consideration received by such individual for the payment, equity would prevail ; for it was- to supply the defects of the law and maintain justice among men that courts of equity were established. To be sure, this is not technically an equitable suit to rescind a contract for fraud or illegality. It is an action at law for the recovery of money; but under Section 5067, of our code of civil procedure, defendants may set forth such grounds of defense a.s they may have, “whether they are such as have been heretofore denominated legal or equitable, or both. ’ ’
The statute, as I have said, is silent as to whether the bridges shall be restored or retained by the county where suit is instituted for the return of the price paid. It is urged by the plaintiff that the loss of the bridge is a penalty contemplated by the statute to be borne by the defendants for their disregard of law. Is this a correct interpretation, or is it rather true that the law is remedial, to protect the public from loss? It is not expressly penal, unless the provision that the contract shall be void, so that both parties are deprived of all its benefits, fixes a sort of penalty. There would seem something of inequality and injustice in providing a heavy penalty, to be borne by the one party to the transactions, the bridge company, while the other parties, the various county officials who consent to the contracts and the unlawful use of the public funds, remain unpunished. True,, an independent punishment is provided for the willful and corrupt misconduct of comissioners; and like conduct of the other contracting parties might as well deserve it. But I am considering now, a condition where, as presented by these demurrers, willful misconduct and intentional violation of law are eliminated.
Until the amendatory statute of 1898 a county whose officials paid out funds in fulfillment of invalid contracts, had no recourse on the recipient. This principle, recognized in Buc *315 chaman Bridge Co. v. Campbell, supra, subjected an innocent public to loss because of the voluntary, but unauthorized acts of its agents. To cure the manifest injustice of the principle, a new remedy was given to the public by the amendment. An action was provided for the recovery of the money and its restoration to the public fund. The reason for the amendment is manifest. The agents of the county exceeded their authority, and although they acted voluntarily, the county did not voluntarily part with its money. The voluntary acts of the officials were not the voluntary acts of the public.
By the amendment, as I construe it, an action was given to the county as represented by its prosecuting attorney, first, to sue and recover back money illegally drawn from the treasury and paid out for bridges; or, secondly, to sue and recover damages resulting from the execution of the' illegal contracts. The second of these remedies might be consistent with the retention of the bridges by the county; but the first, which has been adopted in this case, is in the nature of an entire rescission of the contracts. Can the county elect to rescind the contracts and cling to whatever of value was received under them ?
The ease is not nominally an action to rescind. It is not a suit in chancery, but an action at law for money only.
The effect, however, of a judgment in favor of the plaintiff is equivalent to a rescission of the contracts.
In the early case of Brown v. Witter, 10 Ohio, 142, it was held:
“A purchaser from a vendor who can not make a title has his choice of remedies. Tie may sue at law to recover damages * * * or he may rescind by bill in equity or by an action at law for the purchase money. * * * If he choose to rescind, he must be able to restore to the vendor all he received, and place him back in his original situation.”
In the ease cited, an action at law by a purchaser of land to recover the purchase money paid by him, is considered as a ‘‘rescission-” of the' purchase, and the equitable principle of restoration is deemed applicable in such action at law, as fully as in a suit in chancery.
This action, authorized by the act of 1898, is one at law for money; 'but none the less it rescinds, in behalf of the vendee, *316 tbe purchase of property of value. Agents of the county, exceeding their legal authority, attempted to buy bridges for the county and paid the money of the county for them. The county repudiates the purchase, and demands back the money. If there was no purchase, the county does not own the bridges, and under very familiar principles of equity can not insist on retaining their possession. Although this proposition has not found expression so far as I know in the adjudication of any state court of Ohio, it is very clearly and forcibly enunciated in the case of Lee v. Monro<e Go., decided by the United States Circuit Court of Appeals of the Sixth Circuit (114 Fed., 744; 52 C. C. A., 376), a case which seems to have escaped the attention of counsel, but which bears closely on the points involved in the case before me.
The appellant in the cited case had come into possession as purchaser of certain warrants on the treasurer of Monroe county, issued by the auditor in payment to the Canton Bridge Company, of a balance claimed to be due for bridges constructed by said company for said county. The county treasurer was enjoined from payment of the warrants because the county commissioners in attempting to purchase the bridges had failed to comply with statutory requirements.
• Thereupon, after offers and refusals of compromise, the appellant, complainant below, brought suit asking that on repayment of an amount already received by the bridge company he be adjudged entitled to take down and remove the bridges, and that an account be taken concerning their use by the county, or that if the defendant should elect to keep the bridges, it might do so on condition of paying for them. To this petition the defendant demurred and demurrer was, in the court below, sustained. The court of appeals reversed this decision. I quote some of the language used in the opinion, following a consideration of the Ohio statutes and Buchanan Bridge Co. v. Campbell, supra:
“There is no attempt in this case to enforce these contracts, directly or indirectly, or to collect the value of the bridges under an implied promise to pay for them. The Supreme Court of • Ohio has not declared it to be the public policy of the state to al« *317 low its municipal officers to induce people to part with their property, and then set up its want of power to pay for it and thus appropriate it, because it has -been able to deceive- the persons who furnished it, relying on the ability of the municipality to bind itself. It has announced that contracts made by a municipality in disregard of the statutes of the state are -absolutely void, and will not lay the foundation for a recovery of any part of the price stipulated for in the contract; and that a municipality can not bind itself to pay what property is reasonably worth when it is furnished, in disregard of the statutes. But while the law affords no remedy, equity, although it will not enforce the contract or create a contract between the parties on account of the acceptance and retention of the property, while the property is in existence, and in the hands of the defendant, will not allow it to retain that to which it has no title whatever and prevent the -owner from reclaiming it. The case presented by the bill shows no moral turpitude in the transaction, and, although the bridge company should have ascertained whether each step provided by the statutes had been properly taken, the law placed upon the defendant the duty of taking those steps. It was necessary for it to comply with every provision of the statutes in that behalf before entering into these contracts, and it represented to the bridge -company that it had so complied, and thus misled the bridge company into entering into the agreement, the carrying out of which placed these bridges in the hands of the defendant. The complainant has no remedy at law, and to deny him equitable- relief would be to enforce the contract on the part of the bridge company, and to allow the defendant to repudiate its part of the same contract, and thereby appropriate, without compensation, property to which it had no legal or equitable right. It was said by the federal Supreme Court in the case of Marsh v. Fulton Co., 77 U. S. (10 Wall.), 676, 684:
“ ‘The obligation to dp justice rests upon all persons, natural or artificial; and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.’
“If there was any fraudulent purpose- of the bridge company, or connivance on its part at the action -of the defendant in disregarding the provisions of the statutes, so that the purpose for which -those provisions- were enacted should be thwarted, then neither the bridge company nor this complainant could come into a court of equity and ask any relief, as they could not come into court with clean hands; and the relief would be *318 denied for that reason, and not on the doctrine of the public policy of the state. There is no public policy recognized by the courts which allows any person, natural or artificial, to take the property of another, and appropriate it to its own use, and deny to the person who is innocent of fraud the right to reclaim it. As there was no contract binding on either party in this case, and there-was no fraud cn the part of the bridge company or this complainant, and the property is in existence and in the hands of the defendant, it seems clear that the relief asked for should be granted. The case seems to come entirely within the principles laid down by the Supreme Court in the case of Chapman v. Douglas Co., 107 U. S., 348. See also, Wrought-Iron Bridge Co. v. Utica, 17 Fed. Rep., 316.
“The decree sustaining the demurrer should be reversed and the demurrer overruled, with leave to defendant to answer.”
I have quoted thus extensively from this federal decision because the reasoning seems to me both forcible and pertinent. If a bill in chancery would stand, to compel a county to elect whether or not it would retain bridges or pay for them, and for judgment authorizing the removal of the bridges if they were not paid for, surely in a case where .the county, through its prosecutor, who is legally authorized to sue, has already elected t.o ask the return of the entire purchase money, the party who has furnished the property paid for may, by way of equitable defense -or cross-petition set up the fact alleged in the answers herein. In the answer of the bridge company, they are alleged as defense merely, said defendant praying “to be dismissed hence without day” and “for costs.” The defendants, Elliott and Fronizer with some variation of detail, allege the same facts in substance, and in addition to a prayer for dismissal of the petition ask general equitable relief. In the transactions made the subject of the litigation, however, they acted but as agents of the bridge company, claiming no ownership in either bridges or purchase money, and I do not discover that they have any other than a defensive interest in the controversy.
But all the defendants pray for some action on the part of the court, and on demurrer to the answers, perhaps, the forms of the prayers therein are not important. In the case of Bloch v. Koch, 1 Bull., 91, the Cuyahoga district court reversed a ruling of the *319 lower court which had sustained a demurrer to a petition alleging sufficient facts to constitute a cause of action, but praying for relief to which the petitioner was not entitled.
“It is well settled in this state,” say the court, page 56, “that the prayer forms no part of the petition. That although the pleader is mistaken in the relief which he asks, yet if the facts stated show the party entitled to relief, the court will give such as the case may require. ’ ’
Upon proceedings in érror to this decision, the Supremo Court held in Koch v. Bloch, 29 Ohio St., 565, 567:
“We think the district court were right in reversing the' judgment of the court of common pleas.”
In Tiffin Glass Co. v. Stoehr, 54 Ohio St., 157, the Supreme Court held substantially that a misconception as to the legal rights of a party upon his alleged facts “must be disregarded in passing judgment upon the pleading,” and on page 163, Min-shall, J., in his opinion says: “A prayer for relief is no part of a cause of action.”
The same judge, in Pitts., C. & St. L. Ry. v. Reynolds, 55 Ohio St., 370, 379, used this language:
“If the agreed statement showed the plaintiff entitled to any relief upon the averments of the petition, the court should have awarded it. It makes no difference what the plaintiff may regard the nature of the wrong of which he complains, if the facts stated show that it is a wrong for which he should be compensated,” etc.
In Kerr v. Bellefontaine, 59 Ohio St., 446, the same principle was adhered to, and all the three cases last mentioned were cited approvingly and followed in Coffinberry v. Oil Co., 68 Ohio St., 488, 489, 497, 499. On page 497 it is said that the view that he is not entitled to the specific relief prayed for, “is no reason for sending the plaintiff out of court empty handed. ’ ’ A demurrer had been sustained in the lower courts and the decision was reversed by the Supreme Court.
All the defendants in this case have, in their answers, stated facts which entitle the bridge company to the equitable protection of the court as a prerequisite to the allowance of a judg *320 ment in favor of the plaintiff for the return to the county treasury of the money withdrawn therefrom. That there is no specific prayer for a decree giving this protection is not fatal to the answers, and they are not obnoxious to a demurrer on that account.
I do not hold nor is it my judgment that the petition should have alleged a tender of the bridges to the company. The bridges were placed in their position by the company, not by the county. But the defendants may justly insist, as held in Brown v. Witter, supra, that if the county choose to rescind the purchase of the bridges, it must be able to restore them to the vendor, and place said vendor in its original situation.
In the case of Sportsman Shot Co. v. Shot & Lead Co., 30 Bull., 87, the Superior Court of Cincinnati refused to rescind a contract and conveyance alleged to be illegal as establishing a trust, because one of the parties was unable to place the other in statu quo. See also to like effect Reed v. McGrew, 5 Ohio 375; Brown v. Witter, supra.
This principle does not involve a taking up or removal of the bridges by the county. They are hardly susceptible of specific tender, and even if they were, the law of Ohio, as settled by our 'Supreme Court in like cases of rescission, does not require it. It may be urged, however, with ample support of authority, that, conceding the facts alleged in the answers, the plaintiff should offer, in reply if not in petition, as a condition precedent to recovery, to comply with whatever decree the court may make on those facts. This was subtantially the holding in Saxton v. Seiberling, 48 Ohio St., 554; and in Waters v. Lemmon, 4 Ohio, 229, it was held:
“A decree in equity, on complaint of a purchaser of land, rescinding the contract, and directing the purchase money to be refunded, and leaving the purchaser in unconditional possession of the land purchased, is erroneous. ’ ’
On page 231 of the same case the failure of the plaintiff to offer to surrender the land is seemingly criticised, and the decree of the lower court, conforming to the bill without order of restoration of the land, is reversed. In Railway v. Steinfeld, 42 *321 Ohio St, 449, 450, it was held error to rescind where the complaining party “neither pays back nor offers to return the money received by him under the contract. ’ ’
M. W. Hunt, Basil Meek and H. G. DeRaoi, for plaintiff.
Samuel West, for bridge company.
James Hunt and Lester Wilson, for Fronizer and Elliott.
See, also, Atlas Nat. Bank v. Rheinstrom, 4 N. P., 15, for an implied recognition of the doctrine that in seeking rescission a plaintiff must offer to abide by the decree of the chancellor, and in the same connection a dictum of Judge Follett in Younglove v. Hackman, 43 Ohio St., 69, 74, 75.
The citations are numerous which might be made of adjudications bearing more or less closely on the questions involved in these demurrers. My judgment is, that on principle as well as authority, except as to the so-called second defense of res judicata, they should be and they are therefore overruled. I can not more fittingly close this opinion than by requoting as applicable in a general way to the issues presented and ably discussed by counsel on both sides, the forcible words used by the Supreme Court of the United States in Marsh v. Fulton Co., 77 U. S. (10 Wall.), 676-684, and repeated by Chief Justice Waite in Louisiana v. Wood, 102 U. S., 294, 299:
“The obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.”